**Michael F. GLEESON, M.D., Petitioner**

v.

**STATE BOARD OF MEDICINE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 12, 2005.
Decided March 10, 2006.
Publication Ordered June 7, 2006.
Reargument En Banc Denied
April 28, 2006

David R. Dearden, Wayne, for petitioner.

Sabina I. Howell, Counsel, Harrisburg, for respondent.

BEFORE: COLINS, President Judge, McGINLEY, Judge, and COHN JUBELIRER, Judge.

OPINION BY Judge COHN JUBELIRER.

Michael F. Gleeson, M.D. (Licensee) petitions for review of a Final Adjudication and Order of the State Board of Medicine (Board), which reversed the decision of its hearing examiner, ordered that Licensee be given a public reprimand, pay a civil penalty and complete a course in medical ethics for knowingly aiding, assisting, procuring or advising an unlicensed person to practice medicine in Pennsylvania.

The Board found the following facts. Licensee holds a license to practice medicine and surgery in Pennsylvania. He owned and operated the Pocono Rapid Recovery Center in Monroe County, Pennsylvania (Center), where he performed a variety of laparoscopic surgical procedures on patients. Prior to March 1999, Licensee traveled to the state of Michigan to seek training in endoscopic breast augmentation (EBA) by observing Dr. Michael Gray perform such procedures. In March 1999, Licensee became acquainted with Dr. Robert Grafton, a surgeon *licensed to practice medicine in Michigan,* who had experience performing EBA. Licensee reviewed Dr. Grafton's detailed website which indi-

cated that he was a board-certified surgeon and licensed to practice medicine in Michigan. Licensee procured the services of Dr. Grafton for additional training in EBA and paid him $5,000 each time he traveled to Pennsylvania to be present as Licensee performed EBA at the Center.

In May 1999, a news crew videotaped portions of an EBA being performed on a patient ("the surgical procedure") at the Center. The videotape shows Licensee and Dr. Grafton scrubbed, wearing surgical gowns, and located on either side of the patient. (Bd. Final Adjudication and Order, Findings of Fact (FOF) ¶ 10.) During the operation and in the presence of Licensee, Dr. Grafton, *who is unlicensed in Pennsylvania,* participated in the procedure as follows:

> At one point in the procedure, the videotape shows Dr. Grafton holding a tunneling device in his left hand and *performing a dissection* with the end of the tunneling device necessary *to make a cavity for the breast prosthesis.* Later, Dr. Grafton is viewed taking the tunneling device in his left hand and *inserting the device into the subcutaneous tissue* from the umbilicus towards the patient's right breast.

(Bd. Final Adjudication and Order at 12) (emphasis added).

The Bureau of Professional & Occupational Affairs (Bureau) filed an Order to Show Cause charging that Licensee was subject to disciplinary action pursuant to Section 41(7) of the Medical Practice Act of 1985(Act)[1] for allegedly maintaining a professional connection with or aiding an unlicensed physician. This matter was consolidated with an action initiated against Dr. Grafton, which ultimately resolved by consent agreement and order. At the administrative hearing, the hearing examiner allowed the Bureau to amend the Order to Show Cause, although he later dismissed it with an Adjudication and Order dated December 21, 2004. The hearing examiner found that Dr. Grafton was acting in the capacity of a consultant; concluded that Licensee reasonably believed that Dr. Grafton was licensed to practice in Pennsylvania even if he was not a consultant; and, found that Licensee did not "knowingly" maintain an illegal association with Dr. Grafton, or aid him in the unlicensed practice of medicine.

On January 7, 2005, the Bureau filed an Application for Review with the Board. On the same day, Licensee filed an Application for Award of Attorney's Fees and Costs, which the Board dismissed, without prejudice, because it was currently reviewing the matter. Licensee then filed a Motion to Strike Bureau's Application for Review on January 22, 2005, and filed a Petition for Review (Petition I) with this Court on March 2, 2005, challenging the Board's jurisdiction to review its hearing examiner's decision and challenging the Board's denial of Licensee's Application for Costs. By Order dated June 1, 2005, this Court dismissed Licensee's Petition I.[2]

---

1. Act of December 20, 1985, P.L. 457, *as amended,* 63 P.S. § 422.41(7). This Section provides, in pertinent part:

 > The board shall have authority to impose disciplinary or corrective measures on a board-regulated practitioner for . . . :
 >
 > \* \* \* \*
 >
 > (7) Knowingly maintaining a professional connection or association with any person who is in violation of this act or regulations

of the board or knowingly aiding, assisting, procuring or advising any unlicensed person to practice a profession contrary to this act or regulations of the board.

2. This Court's Order of June 1, 2005 stated that:

 > upon consideration of respondent's motion to dismiss and there being no answer filed thereto, and it appearing that on April 26,

On April 26, 2005, the Board made its own findings of fact and conclusions of law, and reversed the hearing examiner's decision, thereby subjecting Licensee to discipline pursuant to Section 41(7) of the Act. As a preliminary matter, the Board held that it has the ultimate authority, not the hearing examiner, to find facts and reach conclusions, and that it's authority is consistent with Section 9 of the Act, 63 P.S. § 422.9, and Section 5107 of the Medical Care Availability and Reduction of Error (MCARE) Act,[3] which repealed the Health Care Services Malpractice Act.[4] With regard to the Application for Costs, the Board held that, because it did not yet issue a final order, this matter was not ripe for appeal to this Court.

With regard to the merits, the Board found Dr. Kauffman, the Bureau's expert witness, credible that the videotape shows Dr. Grafton practicing medicine and surgery because he was "scrubbed," touched the patient, and actually performed a procedure on a patient that was invasive. The Board also found that Dr. Grafton was not exempt under Section 16 of the Act, 63 P.S. § 422.16, as a "consultant" because Dr. Grafton's conduct culminated in active participation in a medical procedure on a patient. The Board stressed that because Dr. Grafton actively participated in the surgery, he should have been licensed by this Commonwealth.

The Board also found that Licensee *knew* Dr. Grafton was not licensed to practice in Pennsylvania. Licensee admitted that one of the reasons why Dr. Grafton was involved with the surgical procedure was because Dr. Grafton "wanted to move down [to Pennsylvania], *assuming he got his license*, that he wanted to move to Pennsylvania and open up a practice." (Bd. Final Adjudication and Order at 15; FOF ¶ 14) (emphasis added). Moreover, the Board held that, as a matter of common practice, it would be reasonable to assume that Licensee inquired as to Dr. Grafton's licensure in Pennsylvania before hiring him. Therefore, the Board reversed the hearing examiner's determination. On May 18, 2005, Licensee filed his second Petition for Review (Petition II) with this Court.

On appeal, Licensee raises the following six issues for our review: (1) did the Board lack jurisdiction to review and reverse the hearing examiner's adjudication and order; (2) did the Board err in dismissing Licensee's Application for Fees and Costs; (3) did the Board err as a matter of law in ruling that the consulting exemption under the Act, 63 P.S. § 422.16, did not apply to Licensee's use of Dr. Grafton during the surgical procedure; (4) is the consulting

---

2005, the respondent issued an order that is subject of an appeal at No. 1027 C.D.2005, and it further appearing that this matter is now moot in light of the April 26, 2005 order, the motion to dismiss is granted and this court's order of April 29, 2005 is vacated.

3. Section 5107 of the Act of March 20, 2002, P.L. 154, No. 13, imd. effective, provides: Continuation. (a) Orders and Regulations.— Orders and regulations which were issued or promulgated under the former act of October 15, 1975 (P.L. 390, No. 111) [40 P.S. § 1301.101 et seq.], known as the Health Care Services Malpractice Act, and

which are in effect on the effective date of this section shall remain applicable and in full force and effect until modified under this act.

*See* Historical and Statutory Notes to Act 2002–13 legislation in 40 P.S. § 1303.748 ("The commissioner may promulgate regulations to implement and administer this chapter").

4. Act of October 15, 1975, P.L. 390, *as amended*, 40 P.S. §§ 1301.101—1301.1006, repealed by the Act of March 20, 2002, P.L. 154. Supplanted by the MCARE Act, 40 P.S. §§ 1303.101–1303.910.

exemption to licensure unconstitutionally vague; (5) is the Board's Final Adjudication and Order supported by substantial evidence that Licensee knew Dr. Grafton was not licensed and/or knew Dr. Grafton was not exempt from licensure as a consultant; and, (6) did the Board violate Licensee's due process rights by considering evidence that was not part of the underlying record?

 This Court's review of an order of the Board is limited to determining whether constitutional rights have been violated, whether the findings of fact are supported by substantial evidence in the record, and whether any errors of law have been committed. *Taterka v. Bureau of Prof'l and Occupational Affairs, State Bd. of Medicine,* 882 A.2d 1040 (Pa. Cmwlth.2005). The Board is the ultimate fact finder and may accept or reject the testimony of any witness in whole or in part, and this Court is bound by the Board's credibility determinations. *Barran.v. State Bd. of Medicine,* 670 A.2d 765, 768 (Pa.Cmwlth.1996). Thus, when reviewing a decision by the Board, this Court may not re-weigh the evidence which was presented or judge the credibility of witnesses. *Id.*

 Licensee first argues that the Board did not have jurisdiction to vacate the hearing examiner's decision because the MCARE Act completely repealed former Section 905 of the Health Care Services Malpractice Act which had authorized the Board's review. The Board did not issue new regulations under the MCARE Act, giving it authority to review adjudications of hearing examiners, until May 21, 2005. *See* 49 Pa.Code § 16.57. The hearing examiner issued his adjudication and order on December 21, 2004, which was before the new regulations went into effect and after former Section 905 had been repealed. Therefore, Licensee

argues that, at that time, there was no legislatively authorized mechanism which allowed the Board to review the hearing examiner's adjudication. Moreover, Licensee asserts there is nothing in the Administrative Procedures Act that allows exceptions to be filed to an adjudication and order of a *hearing examiner.*

The Board argues that this issue was part of Licensee's Petition I, which this Court dismissed on June 1, 2005, at 461 C.D.2005; thus, *res judicata* bars further argument. Alternatively, on the merits, the Board, citing *Peak v. Unemployment Comp. Bd. of Review,* 509 Pa. 267, 501 A.2d 1383 (1985), argues that it functions as the ultimate authority in adjudicating final orders, whereas the hearing examiner is merely a functionary of the Board, and conducts evidentiary hearings on behalf of the Board. It is upon that record that the Board renders the final adjudication. Furthermore, the Board contends that Section 5107 of the MCARE Act continued orders and regulations issued under the former Act in full force and effect until they could be modified under the MCARE Act. Therefore, the regulations authorizing its review were still in effect, and the procedures to do so were set forth in the Notices accompanying the hearing examiner's order. Finally, the Board asserts that the Pennsylvania Code states that adjudications of an agency head shall be final orders, and that final orders shall include adjudications by the agency head upon appeal of proposed reports. *See* 1 Pa. Code § 35.226. We agree.

 The Board is correct that it had jurisdiction to entertain the Bureau's Application for Review and, in turn, was correct to dismiss Licensee's Application for Award of Attorney's Fees and Costs. We recognize that at the time of the Application for Review, Section 905 of the Health Care Services Malpractice Act, 40 P.S.

§ 1303.905(a), which had authorized the Board's review, was repealed by the MCARE Act. However, Section 5107 of the MCARE Act continued the prior orders and regulations of the Board so there would not be a "vacuum" until new regulations could be adopted. Therefore, the Board did not lack jurisdiction to rule on the Bureau's Application for Review. Additionally, because the hearing examiner's adjudication and order was not the final order, the Board was correct to dismiss Licensee's Application for Award of Attorney's Fees and Costs because it was premature.

■ Next, Licensee argues that the Board erred in finding that Dr. Grafton was practicing medicine and surgery in violation of Section 10 of the Act, which states that "[n]o person other than a medical doctor shall engage in [the practice of medicine and surgery] except as authorized or exempted in this act...." 63 P.S. § 422.10. A "medical doctor" is defined as an individual who has acquired a license to practice medicine and surgery issued by the Board. 63 P.S. § 422.2.

The Act makes clear that only a Pennsylvania Board-licensed medical doctor is permitted to "practice medicine and surgery" in this Commonwealth. 63 P.S. § 422.10. The term "medicine and surgery" is defined in the Act as "[t]he art and science of which the objectives are the cure of diseases and the preservation of the health of man, including the practice of the healing art with or without drugs, except healing by spiritual means or prayer." 63 P.S. § 422.2. The term "healing arts" is defined as "[t]he science and skill of diagnosis and treatment in any manner whatsoever of disease or any ailment of the human body." 63 P.S. § 422.2.

There are several different kinds of licenses that a medical doctor can obtain in order to practice medicine and surgery in Pennsylvania. *See* 63 P.S. §§ 422.25, 422.29–422.34. Of particular importance, a medical doctor licensed without restriction by another state can acquire a "temporary license," which would empower him to "teach medicine and surgery or **participate in a medical procedure** necessary for the well-being of a specified patient within this Commonwealth." 63 P.S. § 422.33(a)(1) (emphasis added). This particular Section of the Act provides a clear distinction between *authorized* practice of medicine and surgery and *unauthorized* practice of medicine and surgery, by requiring a doctor who "participates" in a surgical procedure to obtain, at a minimum, a temporary license in this Commonwealth.

In the case at bar, Dr. Grafton was a Michigan-licensed medical doctor, but was not licensed in any form by this Commonwealth. The Board relied on the expert testimony of Dr. Kaufmann, who opined that Dr. Grafton was engaged in the practice of medicine and surgery based on his observations that Dr. Grafton was scrubbed in and wore surgical attire, touched the patient and performed an "invasive" procedure on the patient when he cut the patient in order "to make a cavity for the breast prosthesis ... [and] insert[ed][a] device into the subcutaneous tissue...." (Bd. Final Adjudication and Order at 12.) Because the Board is the ultimate fact finder, able to accept or reject the testimony of any witness in whole or in part, this Court is bound by its credibility determinations and may not reweigh the credibility decisions made by the Board. *Barran,* 670 A.2d at 768.

Based on Dr. Kaufmann's credible testimony, and reading all sections of the Act *in pari materia,* it is clear that in order for Dr. Grafton to be authorized to *participate* in the surgery *by touching and cutting the patient,* Dr. Grafton was required

to obtain, at a minimum, a temporary license, which he did not have. Thus, the Board was correct in finding that Dr. Grafton was practicing medicine and surgery and, therefore, required to be licensed in Pennsylvania.

■ Next, Licensee argues that the Board erred when it failed to find that Dr. Grafton was acting as a "consultant" and, therefore, exempt from licensure. *See* 63 P.S. § 422.16. Licensee asserts that he properly utilized Dr. Grafton's services as a consultant to assist him with a new surgical technique and to provide him with advice to improve the medical welfare of his patients. The Board argues that Dr. Grafton did not merely "consult;" but that he *actively* participated in the surgical procedure in an invasive manner, which is consistent with "practicing medicine and surgery." We agree with the Board.

The "consultation" exemption of the Act provides that:

> A person authorized to practice medicine or surgery or osteopathy without restriction by any other state may, upon request by a medical doctor, ***provide consultation to the medical doctor*** regarding the treatment of a patient under the care of the medical doctor.

63 P.S. § 422.16 (emphasis added). The term "consultation" is not defined in the Act, the regulations, or the Board's policy statements. However, *Dorland's Illustrated Medical Dictionary* defines "consultation" as "a deliberation by two or more physicians with respect to the diagnosis or treatment in any particular case." *Id.* at 397 (29th ed.2000). Similarly, the term "consult" is defined by *Dorland's* as "to confer with another physician about a case," and the term "consultant" is defined as "a physician called in for advice and counsel." *Id.* Moreover *Black's* defines "consultation" as the "act of asking the advice or opinion of someone." *Black's Law Dictionary* 335 (8th ed.2004).

The consultation exemption of the Act also makes clear that the act of "consulting" is strictly conducted between a doctor unlicensed in Pennsylvania and a licensed Pennsylvania doctor, not between a doctor unlicensed in Pennsylvania and a patient. Here, Dr. Grafton, as a doctor unlicensed in Pennsylvania, did not limit his involvement to consulting with Licensee. Rather, as Dr. Kauffman testified and the videotape demonstrated, Dr. Grafton, "scrubbed" and in surgical attire, physically touched and actually performed a procedure on the patient that was invasive. Therefore, we must agree with the Board that Dr. Grafton's actions clearly exceeded the scope of the consultation exemption.

■ In addition, we note that the Board's membership is comprised of practicing physicians, who have the expertise to determine whether Dr. Grafton performed surgery on the patient, or merely "consulted" with Licensee, the treating physician. Therefore, deference to the Board is appropriate. *See Batoff v. State Bd. of Psychology,* 561 Pa. 419, 750 A.2d 835 (2000).

■ Next, Licensee argues that a narrow interpretation of the term "consultation" would render the statute unconstitutionally vague because there are no clear statements by the Board outlining the extent to which a consultant can safely practice medicine in Pennsylvania without violating the Act. In support of this proposition, Licensee relies on this Court's decision in *Watkins v. State Bd. of Dentistry,* 740 A.2d 760 (Pa.Cmwlth.1999), wherein we found the term "appropriate monitory equipment" unconstitutionally vague, and vacated the Board's order that imposed discipline on him based on that term.

Contrary to Licensee's argument, however, the Act is not unconstitutionally vague because, when read as a whole, it provides a meaning of the term "consultation." The consultation exemption provides that a medical doctor licensed in another state may *"provide consultation to the medical doctor"* regarding the treatment of a patient under the care of the medical doctor." 63 P.S. § 422.16 (emphasis added). It is, thus, clear that a consultant works directly with the medical doctor who is treating the patient and does not treat the patient or administer care in any form because that role lies solely with the treating doctor who is licensed in this Commonwealth. Accordingly, we find that the consultation exemption to the Act is not unconstitutionally vague.

■■■ Next, Licensee argues that the Board's Final Adjudication and Order was not supported by substantial evidence because, at the time of the surgical procedure, Licensee did not "know" that Dr. Grafton was not licensed in Pennsylvania and/or did not qualify for an exception under the Act.

Section 41(7) of the Act provides, in pertinent part:

The board shall have authority to impose disciplinary or corrective measures on a board-regulated practitioner for . . .:

\* \* \* \*

(7) Knowingly maintaining a professional connection or association with any person who is in violation of this act or regulations of the board or *knowingly* aiding, assisting, procuring or advising any unlicensed person to practice a profession contrary to this act or regulations of the board.

63 P.S. § 422.41(7) (emphasis added). The Act does not define the term "knowingly," however, Black's Law Dictionary defines the term "knowing" to mean "[h]aving or showing awareness or understanding," and defines "constructive knowledge" as "knowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person." *Id.* at 888 (8th ed.2004).

Licensee argues that the Board improperly selected testimony from the record and mischaracterized it to imply that Licensee knew that Dr. Grafton was licensed in Pennsylvania. (*See* FOF ¶ 14 (citing Test. at 108).) Reading the testimony as a whole, Licensee contends that it is clear that he came to know of Dr. Grafton's unlicensed status about two months **after** the surgical procedure. (*See* Test. at 110–11.) Licensee further argues that the Board improperly focused on a part of the transcript that referred to a time when Licensee admitted that he did learn that Dr. Grafton did not have a Pennsylvania license. There, the Bureau prosecutor asked Licensee whether "at some point in time" he became aware that Dr. Grafton was not properly licensed, to which Licensee replied, "yes." (Test. at 108.) He argues that the words "at some point in time" cannot reasonably be construed to mean "prior to the surgical procedure." Finally, Licensee argues that it is sheer speculation to assume that Licensee had knowledge that Dr. Grafton was not licensed in Pennsylvania just because he reviewed Dr. Grafton's website. We disagree.

The Board relied on Licensee's own admissions that he knew Dr. Grafton was not licensed to practice medicine in Pennsylvania because Licensee testified that: (1) one of the reasons Dr. Grafton was involved with the surgical procedures was "that he wanted to move down, *assuming that he got his license,* that he wanted to move to Pennsylvania and open up a practice" (Test. at 108) (emphasis added); and

(2) even when he "discovered" Dr. Grafton was unlicensed, he only limited Dr. Grafton's role and did not require him to completely stop practicing medicine in Pennsylvania. *Id.* at 108–09. Although Licensee later testified that he did not know Dr. Grafton was not licensed to practice medicine in Pennsylvania until after the surgical procedure in question, *id.* at 110–11, the Board chose not to credit this particular testimony, which is within its sole discretion. *Barran.* Thus, this Court will not re-weigh the evidence and testimony already presented. *Barran.*

Moreover, Licensee reviewed Dr. Grafton's detailed and professional web site, indicating that Dr. Grafton was a board-certified surgeon and licensed to practice medicine, before hiring him for assistance at his practice. (FOF ¶¶ 5.) Thus, the Board's inference that Licensee, as a licensed practitioner, had knowledge of Dr. Grafton's non-licensure was reasonable based on the facts of record. *See Shrader v. State Bd. of Veterinary Medicine*, 673 A.2d 1, 2 (Pa.Cmwlth.1995). We find that this inference is not only reasonable, but must be given effect because of the expertise and experience that the Board enjoys. *Shrader,* 673 A.2d at 2.

Licensee argues that the facts in this case can be easily distinguishable from this Court's decision in *Shrader,* upon which the Board relied in finding that Licensee had knowledge of Dr. Grafton's non-licensure in Pennsylvania. In *Shrader,* the State Board of Veterinary Medicine suspended the licensee's license and imposed a civil penalty for *knowingly* employing an unlicensed person to practice veterinary medicine. There, the licensee employed an unlicensed foreign veterinary school graduate for approximately six years, who had performed surgery on animals. *Shrader,* 673 A.2d at 2. The Board found that the licensee knew the graduate

student was unlicensed because licensed veterinarians are required to bi-annually renew their licenses, keep said licenses conspicuously displayed in their principle place of business, and this graduate failed to conspicuously display any license. *Id.* On appeal, this Court found substantial evidence to support the Board's determination that the licensee knew the graduate student was unlicensed based on reasonable inferences from the evidence of record and the facts which are commonly known to all professionals in the field of veterinary medicine. *Id.* We held that the graduate student only performed surgery under the direct supervision of the licensee and that, *"as a matter of common practice, it would be reasonable to assume that when Petitioner hired [the graduate student] he first ascertained whether [the graduate student] was licensed in Pennsylvania."* *Shrader,* 673 A.2d at 3 (emphasis added). Furthermore, even if the licensee did not know of the graduate student's non-licensure at the commencement of his employment, he could not have failed to notice, in the six years that he worked alongside the graduate student, that the graduate student did not display a Pennsylvania license as required by law. *Id.* Therefore, we held that the inferences deduced by the Board were reasonable and sufficient to find that the licensee *knowingly* employed an unlicensed person to practice veterinary medicine. *Id.*

In the case at bar, Licensee argues that the facts herein are distinguishable from *Shrader* because the individual who performed veterinary surgery in that case was not licensed in any state; the veterinary statute contains no consulting exemption for a guest veterinarian; the individual performed six years of daily procedures; and, the individual did not post his license as required. However, we fail to see Licensee's reasoning. In *Shrader,* the burden of proving "knowing" conduct was met

when the licensee did not verify upfront that the person he hired to perform surgery was licensed to practice veterinary medicine in Pennsylvania. *Shrader,* 673 A.2d at 3. Here, too, Licensee never verified that Dr. Grafton was licensed in Pennsylvania before or after he sought Dr. Grafton's services in another state, reviewed his detailed and professional web site, and paid him $5,000 per visit. Therefore, we find substantial evidence to support the Board's findings and conclusion that Licensee knew Dr. Grafton was not licensed to practice medicine in Pennsylvania.

■ Finally, Licensee argues that the Board violated his due process rights when it considered Dr. Grafton's Consent Agreement, which the Bureau withdrew before the hearing officer. Licensee asserts that the Board specifically refers to the Consent Agreement in its Final Adjudication and Order on page 6, footnote 4. Therefore, Licensee contends that because the Board considered a document that was not part of the administrative record, it violated Licensee's due process rights. *Ross v. Civil Serv. Comm'n,* 98 Pa.Cmwlth. 565, 511 A.2d 941 (1986). We disagree.

The reference to Dr. Grafton's Consent Agreement, located in the history section of the Board's Final Adjudication and Order, noted that the consolidated action against Licensee and Dr. Grafton had been resolved as to Dr. Grafton by the acceptance of a Consent Agreement, and included a footnote in the Findings of Fact that the Consent Agreement settled charges that Dr. Grafton had engaged in the unlicensed practice of medicine. We agree with the Board's argument that, pursuant to Section 35.173 of the General Rules of Administrative Policy and Procedure, 1 Pa. Code § 35.173, the agency head may take official notice of such matters as might be judicially noticed by the Courts of this Commonwealth. Here, the Board properly took judicial notice of its own records and, therefore, in so doing, did not violate Licensee's due process rights. Additionally, we note that the Board independently reviewed all of the evidence presented and thoroughly analyzed the Act in concluding that Dr. Grafton practiced medicine in this Commonwealth without a license. Therefore, we find no violation of Licensee's due process rights.

Accordingly, the order of the Board is affirmed.

### ORDER

**NOW,** March 10, 2006, the order of the State Board of Medicine in the above-captioned matter is hereby affirmed.

DISSENTING OPINION BY President Judge COLINS.

I must respectfully dissent from the scholarly opinion of the majority. I agree with both the ruling and the conclusions of the hearing examiner. Therefore, I would reverse the Board and vacate the penalties imposed.