# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Zafar Iqbal,                                      :
                            Petitioner            :
                                                  :
             v.                                   :
                                                  :
Bureau of Professional and                        :
Occupational Affairs,                             :
State Board of Medicine,                          :   No. 1190 C.D. 2020
                            Respondent            :   Submitted: February 4, 2022


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge
           HONORABLE LORI A. DUMAS, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON              FILED: April 18, 2022


        Zafar Iqbal (Dr. Iqbal) petitions for review of the November 2, 2020, order of the State Board of Medicine (Board) revoking his license to practice medicine in Pennsylvania on the basis of multiple incidents of unwanted sexual advances toward nurses and medical support staff. The Board concluded that revocation is warranted because Dr. Iqbal's conduct violated the prohibition on immoral and unprofessional conduct set forth in the Medical Practice Act of 1985[1] (MPA) and its associated regulations. Upon review, we affirm.

---

[1] Act of December 20, 1985, P.L. 457, *as amended*, 63 P.S. §§ 422.1-422.53.

## I. Background and Procedural Posture

Dr. Iqbal has been a licensed medical doctor in Pennsylvania since 1990 and specializes as a nephrologist. Hearing Officer's Op., 7/17/20, at 5; Certified Record (C.R.) #23. In 2003, Dr. Iqbal lost his practice privileges at the Fresenius Dialysis Center after allegations of sexual harassment by several nurses. *Id*. at 9 & n.9. In 2012, after an incident involving unwanted sexual contact with a nurse when he was practicing at UPMC Passavant (UPMC), Dr. Iqbal received a warning but no formal discipline. *Id*. at 9 & n.10.

On August 1, 2015, while still at UPMC, Dr. Iqbal made unwanted physical advances toward a nurse, M.S.,[2] in an elevator, by kissing her and putting his tongue in her mouth; she reported it to her superiors the same day. Hearing Officer's Op. at 5-7. After an investigation and internal proceedings, UPMC's board of trustees revoked Dr. Iqbal's hospital privileges as of March 17, 2016. *Id*. at 7-10. Then, on November 7, 2017, while working for Curahealth in Oakdale, Dr. Iqbal sexually assaulted a medical records clerk, K.F., who reported it to the police on November 9, 2017. *Id*. at 10-12. Dr. Iqbal was suspended from Curahealth and after a bench trial on November 20, 2018, he was convicted of one count of simple assault (a second-degree misdemeanor) and three counts of harassment (a third-degree misdemeanor);[3] he was sentenced to five years of probation. *Id*. at 12-13.

In November 2019, the Bureau of Professional and Occupational Affairs (Bureau) filed an Order to Show Cause (OTSC) against Dr. Iqbal, alleging that in association with the M.S. and K.F. incidents, he was being charged with seven counts of unprofessional and/or immoral conduct in violation of the MPA and its

---

[2] For confidentiality purposes, the victims' names are limited to their initials.

[3] *See* 18 Pa.C.S. §§ 2701(a), 2709.

regulations. OTSC, 11/8/19, at 2-11; C.R. #1. The OTSC advised Dr. Iqbal that his state medical license could be revoked and he could be assessed civil fines of up to $10,000 per violation. *Id*. at 11-12.

At hearings on February 26-27, 2020, two UPMC doctors testified about the 2012 incident. M.S. testified about the 2015 incident, as did two of her superiors, as well as two doctors involved in UPMC's investigation, two police officers, and the professional conduct investigator who worked on M.S.'s report. K.F. testified as to the 2017 incident, as did the police officer and the professional conduct investigator who investigated it. The Bureau also presented an expert on medical ethics and conduct.

Dr. Iqbal testified that the M.S. incident was not an unwanted advance. He had suggested to her that they speak privately about her personal "problems" after he finished with his patients. Notes of Testimony (N.T.), 2/27/20, at 433. They first went to a seating area on the fifth floor away from the nurses' station, then to the elevator for more privacy. *Id*. at 436. She was upset and tearful and since they knew each other, he gave her a hug and a peck on the cheek. *Id*. at 437-39. In the elevator, they went up and down to various floors because they were confused, then when they returned to the fifth floor and were exiting the elevator, he gave her a hug, his lips accidentally brushed against hers, then they went in different directions. *Id*. at 441-42. He denied putting his tongue in her mouth or throat. *Id*. at 444 & 487.

Dr. Iqbal acknowledged that when UPMC leadership asked if he kissed M.S., he said he had, even though it was accidental, because he wanted to be truthful, but he had not known the nature of the allegations against him when he admitted to kissing her. N.T., 2/27/20, at 443, 486 & 495. He acknowledged telling them that his actions towards M.S. were inappropriate. *Id*. at 485-86. Nevertheless, he

3

believes M.S. has lied about it being non-consensual. *Id*. at 561. He confirmed that he had been warned after the 2012 incident. *Id*. at 488-93. He also believed that better video of the incident existed and would have cleared him, but it was "obstructed" and never shown to the UPMC investigative panel. *Id*. at 558 & 564.

With regard to K.F., Dr. Iqbal admitted that he kissed her and touched her breasts but stated that she consented and put his hand on her breasts. N.T., 2/27/20, at 445. He believed they were going to have an extramarital affair and that she wanted to go out and have a good time with him; he maintains that she is lying about the encounter being non-consensual. *Id*. at 446, 461 & 560. He acknowledges that he was convicted of charges arising from the incident, but criticized Detective Cokus, the investigating police officer, for having misled him about there being video of the K.F. incident and for tearing up his first written statement suggesting that the incident had been consensual. *Id*. at 453, 464, 483, & 558.

Dr. Iqbal acknowledged that his practice privileges at Fresenius were revoked in 2003 after several allegations of sexual harassment by nurses. N.T., 2/27/20, at 468-69. He stated that he has had about 15 extramarital affairs, about half with women from his medical workplaces who were nurses or support staff. *Id*. at 471-76. He maintained that in the past, allegations of sexual harassment have been lodged against him after an affair soured. *Id*. at 552-53.

Dr. Iqbal agreed that if he had acted in the way M.S. and K.F. alleged and the incidents had been non-consensual, it would have been improper in the hospital workplace setting. N.T., 2/27/20, at 500-01. He acknowledged that he had an opportunity for a further hearing before the UPMC Medical Committee, but refused to attend because he was not given video that he believes would have cleared him. *Id*. at 569-71.

4

The hearing officer credited M.S. and K.F. and described their testimony as consistent, credible, and corroborated: "More specifically, their body language, tears, as well as the tone and tenor of [their] voice[s] lent credibility to the veracity of their testimony." Hearing Officer's Op. at 17. The hearing officer also credited the Bureau's additional witnesses and discredited Dr. Iqbal. *Id.* The hearing officer therefore concluded that Dr. Iqbal had violated the MPA's prohibition on unprofessional and immoral conduct as to the M.S. and K.F. incidents. *Id.* at 18-28. Weighing the seriousness of Dr. Iqbal's offenses with the lack of any "meaningful" mitigation evidence, the hearing officer concluded that Dr. Iqbal's medical license should be revoked.[4] *Id.* at 28-30 & Order. The Board adopted the hearing officer's opinion in full. Board's Op., 11/2/20; C.R. #30. Dr. Iqbal then petitioned this Court *pro se* for review.[5]

## II. Parties' Arguments

Dr. Iqbal argues that the Board's revocation of his medical license was arbitrary and capricious. Dr. Iqbal's Br. at 3. He claims that M.S. should not have been found credible because she stated in her testimony that she reported the August 1, 2015, incident to the police several days after it occurred, but the police report taken by Sergeant Itri was taken several weeks later on August 29, 2015. *Id.* at 3-4.

---

[4] The hearing officer also imposed a civil penalty of $1,000 against Dr. Iqbal. Hearing Officer's Order. The Board reversed the penalty *sua sponte*, explaining that revocation of Dr. Iqbal's medical license was sufficient to ensure public health and safety, and it is not at issue here. Board's Op., 11/2/20, at 6.

[5] Dr. Iqbal's petition for review was filed on November 23, 2020. He then filed amended petitions for review on January 19, 2021, and February 3, 2021. This Court struck those filings as they sought to add new claims not contained in the original petition and the appeal period from the Board's determination had lapsed. Order, 2/3/21, & Order, 2/4/21 (citing Pa.R.A.P. 1513(d)(5)). We therefore consider only the merits of Dr. Iqbal's original petition.

5

He claims that the settlement funds M.S. received from her lawsuit against him and UPMC arising from the incident were fraudulently acquired. *Id*. at 9.

Similarly, Dr. Iqbal claims that K.F. should not have been found credible, because she stated that Dr. Iqbal had blood on his shirt that stained her shirt during the November 7, 2017, incident and that she gave her shirt to the police, but Detective Cokus testified that she did not give him the shirt; Dr. Iqbal asserts that K.F. lied about the shirt and therefore falsified evidence against him. *Id*. at 4-5 & 9.

Dr. Iqbal claims that Detective Cokus likewise should not have been found credible, because he admitted misleading Dr. Iqbal during their interview by stating he would be reviewing video of the K.F. incident that ultimately did not exist and also acknowledged disposing of Dr. Iqbal's initial written statement that asserted the K.F. incident had been consensual. *Id*. at 6-7. Dr. Iqbal asserts that his subsequent admission to Detective Cokus that the incident was not consensual was therefore a product of duress and obstruction of justice, such that his criminal convictions arising from the K.F. incident were invalid. *Id*. at 7-8. He adds that the hearing officer deliberately excluded an allegedly exculpatory report by Dr. Wettstein, a forensic psychologist who examined Dr. Iqbal in June 2017 as part of the Bureau's investigation of the M.S. matter. *Id*. at 9. He asks this Court to reinstate his medical license, overturn his criminal convictions, and institute criminal proceedings against M.S., K.F., and Detective Cokus. *Id*. at 9.

The Bureau responds that the Board's decision to revoke Dr. Iqbal's medical license was supported by substantial evidence of record and that Dr. Iqbal has not established that the revocation was either arbitrary or capricious. Bureau's Br. at 12. The Bureau notes that the hearing officer applied the appropriate preponderance of the evidence standard rather than the criminal standard of proof

6

beyond a reasonable doubt, and that any discrepancies in M.S. and K.F.'s testimony were ancillary to the main issue of whether the assaults occurred. *Id*. at 15. The Bureau avers that Dr. Iqbal's attempt to discredit Detective Cokus is likewise immaterial in light of the extensive evidence that Dr. Iqbal committed the actions that led to his criminal conviction arising from the K.F. incident. *Id*. at 20-21.

### III. Discussion

Physician disciplinary sanctions are within the Board's discretion and must be upheld unless the Board acted in bad faith or fraudulently or the sanction constitutes capricious action or a flagrant abuse of discretion. *Slawek v. State Bd. of Med. Educ. & Licensure*, 586 A.2d 362, 364-66 (Pa. 1991); *Tandon v. State Bd. of Med.*, 705 A.2d 1338, 1346 (Pa. Cmwlth. 1997). Generally, a reviewing court may not substitute its judgment for that of the agency whose decision is being reviewed. *Slawek*, 586 A.2d at 365-66. This Court's review is therefore limited to determining whether constitutional rights have been violated, whether the findings of fact are supported by substantial record evidence,[6] and whether errors of law have been committed. *Gleeson v. State Bd. of Med.*, 900 A.2d 430, 435 (Pa. Cmwlth. 2006). The Board is the ultimate fact finder and may accept or reject the testimony of any witness in whole or in part, and this Court is bound by those determinations. *Id*. Thus, when reviewing a decision by the Board, this Court may not re-weigh the evidence which was presented or judge the credibility of witnesses. *Id*.

The Board is charged with the responsibility and authority to oversee the medical profession and to determine the competency and fitness of an applicant

---

[6] "Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support [a] conclusion." *Taterka v. Bureau of Pro. & Occupational Affs., State Bd. of Med.,* 882 A.2d 1040, 1044 n.4 (Pa. Cmwlth. 2005).

7

to practice medicine within the Commonwealth. *Barran v. State Bd. of Med.*, 670 A.2d 765, 767 (Pa. Cmwlth. 1996). Section 41 of the MPA, titled "Reasons for refusal, revocation, suspension or other corrective actions against a licensee or certificate holder," states that the Board "shall have authority to impose disciplinary or corrective measures on a board-regulated practitioner for any or all of the following reasons":

> (6) Violating a lawful regulation promulgated by the board or violating a lawful order of the board previously entered by the board in a disciplinary proceeding.
>
> . . . .
>
> (8) Being guilty of immoral or unprofessional conduct. Unprofessional conduct shall include departure from or failing to conform to an ethical or quality standard of the profession. In proceedings based on this paragraph, actual injury to a patient need not be established.

63 P.S. § 422.41(6), (8). The Board's regulations further provide that "A Board-regulated practitioner who engages in unprofessional or immoral conduct is subject to disciplinary action under section 41 of the [MPA] (63 P.S. § 422.41)." 49 Pa. Code § 16.61(a). This subsection lists actions related to patient care that would warrant discipline, but the list is not limited to patient care. *Id.* Immoral conduct also includes "[t]he commission of an act involving moral turpitude, dishonesty or corruption when the act directly or indirectly affects the health, welfare or safety of citizens of this Commonwealth." 49 Pa. Code § 16.61(b).

Although Section 16.61 also states that a criminal conviction is not required for disciplinary action, a conviction or guilty plea involving conduct pertaining to medical practice is admissible and relevant to disciplinary proceedings

8

for the same actions at issue in the criminal matter. *Herberg v. State Bd. of Med. Educ. & Licensure*, 442 A.2d 411, 413 (Pa. Cmwlth. 1982) (guilty plea to felony drug charges admissible in revocation proceedings). Disciplinary proceedings, however, are conducted on the basis of a preponderance of the evidence standard rather than the criminal standard of beyond a reasonable doubt. *Lyness v. State Bd. of Med.*, 561 A.2d 362, 369 (Pa. Cmwlth. 1998). Deference is accorded to the Board's determination of what constitutes unprofessional and immoral conduct. *Starr v. State Bd. of Med.*, 720 A.2d 183, 190 (Pa. Cmwlth. 1998).

In *Tandon*, a doctor's medical license in Tennessee had been suspended for unwanted sexual advances toward his receptionist and a female insurance agent. 705 A.2d at 1341. He relocated to Pennsylvania, reactivated his prior Pennsylvania license, and began practicing as the only oncologist at his new hospital, with a case load of 170 cancer patients per month. *Id*. The Bureau, citing Section 41 of the MPA, began reciprocal disciplinary action based on his Tennessee record. *Id*. at 1342. A hearing officer imposed a three-year suspension (mostly stayed), which was upheld by the Board. *Id*. This Court affirmed, noting that but for the doctor's patient case load and the lack of other oncologists at the facility, the discipline for his misconduct would likely have been more severe. *Id*. at 1346.

In *Flickinger v. Department of State*, 461 A.2d 336 (Pa. Cmwlth. 1983), multiple sexual harassment and assault complaints had been filed against the doctor, a chiropractor, by both patients and staff where he practiced. *Id*. at 337. Under provisions of the chiropractor conduct law analogous to Section 41 of the MPA, his license was revoked. *Id*. The doctor argued that misconduct involving staff should not be subject to professional discipline because it did not impact patient care and well-being, but this Court disagreed and upheld the revocation, finding extensive

9

support in the record of multiple incidents of sexual misconduct and no mitigating evidence. *Id*. at 337-38.[7]

Ta*Tandon* and *Flickinger* establish that doctors found to have sexually assaulted nurses and medical support staff are subject to discipline, up to and including license revocation. Apart from the mitigating evidence of an extensive patient case load in *Tandon*, the primary reason for lenience in cases involving sexual misconduct has been when too much time has elapsed and the principle of laches applied because memories had faded and witnesses were not available. *See Shah v. State Bd. of Med.*, 589 A.2d 783 (Pa. Cmwlth. 1991) (over four years between alleged incident and report by patient to Board); *Lyness* (victims did not report incidents for several years). Dr. Iqbal has not argued laches in this matter and, in any event, M.S. and K.F. promptly reported their incidents with Dr. Iqbal.

Here, the Bureau presented evidence of Dr. Iqbal's unwanted sexual contacts dating back to 2003, when he lost his practice privileges at Fresenius after multiple staff reports. Hearing Officer's Op. at 9 & n.9, Findings of Fact (F.F.) 41. The record also includes the testimony of Dr. Robert Volosky, who observed the 2012 incident at UPMC in which Dr. Iqbal verbally propositioned a nurse, and Dr. Rupa Mokkapatti, who stated that the incident led to an informal (but documented) inquiry after which Dr. Iqbal admitted wrongdoing, accepted a warning, and promised not to do it again. N.T., 2/26/20, at 24-41 & 237-39.

Despite that assurance, in 2015, Dr. Iqbal assaulted M.S. in an elevator, which she recalled included him "shov[ing] his tongue down [her] throat." Hearing

---

[7] Our courts have also consistently upheld revocation of doctors' medical licenses for improper sexual harassment or conduct regarding patients. *Telang v. Bureau of Pro. & Occupational Affs.*, 751 A.2d 1147 (Pa. 2000); *Yousufzai v. Bureau of Pro. & Occupational Affs., State Bd. of Med.*, 793 A.2d 1008 (Pa. Cmwlth. 2002); *Starr v. State Bd. of Med.*, 720 A.2d 183 (Pa. Cmwlth. 1998).

Officer's Op. at 5-7 & 20. M.S. reported it immediately to three superiors, two of whom testified consistently concerning her account of the incident. N.T., 2/26/20, at 89-97 & 105-17. Several weeks later, M.S. also reported the incident consistently to the police. *Id*. at 119-27. M.S. subsequently told the UPMC investigating panel, which found her credible, and the professional conduct investigator gathering evidence for these disciplinary proceedings, who found her "sincere." *Id*. at 301-03 & 249-57. Ultimately, the hearing officer also credited M.S.'s account, to which she testified in person. Hearing Officer's Op. at 17.

Dr. Iqbal maintains that the incident with M.S. was not an unwanted advance in light of their prior friendly relations, but proffered no evidence or witnesses to support his assertion. The UPMC investigative panel did not find his version of the incident as consensual to be credible, and neither did the hearing officer. N.T., 2/26, 20, at 303-08 & 314; Hearing Officer's Op. at 17. Moreover, Dr. Steven Jones of UPMC, whom the hearing officer found credible, testified that shortly after the incident, when he and the Leadership Council conducted an initial inquiry, Dr. Iqbal admitted he had "crossed a line" with M.S. and that he regretted the incident. *Id*. at 154-61. Dr. Iqbal's attempts to discredit M.S. were rejected by the hearing officer, who found the passage of several weeks before M.S. reported the matter to the police irrelevant in light of the fact that she immediately reported it at UPMC and did ultimately report it to the police. Hearing Officer's Op. at 20 & 23.

After UPMC revoked Dr. Iqbal's hospital privileges in March 2016, he began practicing at Curahealth, but his episodes of misconduct did not cease and, in fact, escalated to the 2017 physical assault on K.F., who stated she had no prior relationship with him at all when he came into her office to sign medical records,

11

then violently attacked her, "stuck his tongue down [her] throat," ground his body against hers in a bear hug, and grabbed at her breasts, bruising them. N.T., 2/27/20, at 373-76. Two days later, she reported the incident to Curahealth and the police. *Id*. at 337-38.

Detective Cokus, who investigated the K.F. incident, stated he was suspicious of Dr. Iqbal's verbal and written assertions that the incident had been consensual, so he used an accepted technique of misleading Dr. Iqbal by mentioning there was video of the incident that would clear up any questions, at which point Dr. Iqbal admitted the incident had not been consensual. N.T., 2/27/20, at 346-49 & 355-58. Dr. Iqbal's criminal conviction on misdemeanor charges of simple assault and harassment arising from the K.F. incident after a counseled bench trial (with stipulated evidence) in Allegheny County was admitted at the hearing and acknowledged by Dr. Iqbal in his testimony.[8] Hearing Officer's Op. at 4 & n.4.

The hearing officer credited K.F. and Detective Cokus and found Dr. Iqbal's account of the incident as consensual to be not credible. Hearing Officer's Op. at 17 & 24. The hearing officer also described this incident as an escalation in the severity of Dr. Iqbal's conduct, particularly after he received a warning following the 2012 incident at UPMC and ultimately lost his UPMC hospital privileges after the M.S. incident in 2015. Hearing Officer's Op. at 23. The hearing officer dismissed Dr. Iqbal's attempt to discredit K.F. by arguing about whether blood on his shirt stained her shirt during the incident as immaterial to whether the incident was nonconsensual and amounted to immoral and unprofessional conduct. *Id*. at 24.

---

[8] Dr. Iqbal now contends that his conviction was unjust, but the record contains no indication that he appealed it within the appropriate timeframe.

The hearing officer concluded that the Bureau proved all of the charges against Dr. Iqbal, whose actions amounted to immoral and unprofessional conduct as set forth in Section 41 of the MPA and Section 16.61 of the associated regulations. *Id*. at 19 & 25. Given the preponderance standard, the breadth and consistency of the Bureau's evidence, and Dr. Iqbal's lack of rebuttal or mitigating evidence, the hearing officer's conclusions were supported by substantial evidence of record and were not legally erroneous, arbitrary, or capricious.

As to sanctions, the hearing officer considered the numerous and escalating instances of Dr. Iqbal's misconduct, the revocation of his UPMC hospital practice privileges after the M.S. incident, his criminal conviction arising from the K.F. incident, and his lack of any mitigating evidence. Hearing Officer's Op. at 30. The hearing officer concluded that "despite numerous warnings, including collegial interventions and revocation of privileges at various medical facilities, [Dr. Iqbal] [cannot], or will not, act in a professional, ethical or moral manner. Thus, a severe sanction is warranted." Hearing Officer's Op. at 30. The hearing officer therefore ordered Dr. Iqbal's medical license revoked. *Id*. The Board adopted the hearing officer's findings and conclusions in full, dismissed Dr. Iqbal's exceptions attacking the credibility and conduct of the witnesses who testified for the Bureau, and upheld the revocation of his medical license. Board's Op. at 2-6.

We agree with the Board that the extensive evidence presented by the Bureau and summarized above fully supports the sanction of revocation. That determination was amply supported by substantial evidence of record and was not legally erroneous, arbitrary, or capricious. This result is also consistent with the holdings of *Tandon* and *Flickinger*, where this Court has upheld severe sanctions for

13

doctors found to have violated the MPA and its regulations against unwanted sexual advances and attacks on nurses and support medical staff.

In his brief, Dr. Iqbal again argues that M.S., K.F., and Detective Cokus should not have been found credible. Dr. Iqbal's Br. at 3-5. However, credibility determinations are firmly reserved to the factfinder (the Board) and this Court has no basis or authority to overturn such determinations. *Gleeson*, 900 A.2d at 435. Moreover, as the hearing officer pointed out, Dr. Iqbal's assertions of inconsistencies in the testimony of both M.S. and K.F. pertain to minor or ancillary matters rather than these victims' accounts of the incidents themselves, which were the basis of the Board's revocation decision and which were unequivocally found credible, consistent, and corroborated by other evidence of record. Hearing Officer's Op. at 17, 19 & 23-24. Likewise, Detective Cokus was found credible by the hearing officer, and as explained above, this Court may not disturb that determination. *See Gleeson*, 900 A.2d at 435. Moreover, the hearing officer's opinion does not indicate that Detective Cokus's testimony was relied on for any specific finding or served as anything other than a supplemental or corroborative source to that of M.S., K.F., and the hospital personnel who corroborated their accounts. *See* Hearing Officer's Op. at 17 & 23-25.

## IV. Conclusion

As the Board's determination was supported by substantial evidence of record and Dr. Iqbal has not shown that the Board acted arbitrarily, capriciously, or

in a legally erroneous manner, we affirm the Board's order revoking Dr. Iqbal's license to practice medicine in Pennsylvania.[9]

_____
CHRISTINE FIZZANO CANNON, Judge

---

[9] Dr. Iqbal's assertions in his brief that M.S. fraudulently received settlement funds from her civil suit against him, that his criminal conviction should be overturned, and that criminal proceedings should be instituted against K.F. and Detective Cokus for alleged fabrication of evidence and obstruction of justice, are waived because they were not brought before the administrative tribunals. *See K.J. v. Pa. Dep't of Pub. Welfare*, 767 A.2d 609, 612 (Pa. Cmwlth. 2001) (explaining that "when a party fails to raise an issue . . . in an agency proceeding, the issue is waived and cannot be considered for the first time in a judicial appeal"). Moreover, Dr. Iqbal has not asserted any legal basis on which this Court could exercise appellate jurisdiction over these criminal or private civil matters. *See* 42 Pa.C.S. §§ 761-763.

As for Dr. Iqbal's additional assertion that the hearing officer deliberately excluded an allegedly exculpatory report by Dr. Wettstein, our review of the record reveals no indication that Dr. Iqbal presented such a report for admission during the hearing or that he raised it to the Board. Moreover, Dr. Iqbal fails to develop this argument in his brief with citations to either the record or relevant authority, as required by Pennsylvania's Rules of Appellate Procedure. Pa.R.A.P. 2119(a); *Skytop Meadow Cmty. Ass'n, Inc. v. Paige*, 177 A.3d 377, 384 (Pa. Cmwlth. 2017) (stating that "[w]hen parties fail to satisfy this requirement, the Court is neither obliged, nor even particularly equipped, to develop an argument for [them]"); *see also K.J.*, 767 A.2d at 612.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Zafar Iqbal,                              :
                    Petitioner            :
                                          :
          v.                              :
                                          :
Bureau of Professional and               :
Occupational Affairs,                     :
State Board of Medicine,                  :    No. 1190 C.D. 2020
                    Respondent            :

O R D E R

AND NOW, this 18th day of April, 2022, the November 2, 2020, order of the State Board of Medicine revoking Dr. Zafar Iqbal's license to practice medicine in Pennsylvania, is AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge