**Jagjit S. TANDON, M.D., Petitioner,**

v.

**STATE BOARD OF MEDICINE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 8, 1997.

Decided Dec. 10, 1997.

---

1. 18 Pa.C.S. § 3701.

2. *Id.,* § 3925.

3. *Id.,* § 3921.

4. *Id.,* § 5506.

5. 42 Pa.C.S. §§ 9541 *et seq.*

Charles I. Artz, Harrisburg, for petitioner.

Gerald S. Smith, Harrisburg, for respondent.

Before KELLEY and LEADBETTER, JJ., and RODGERS, Senior Judge.

KELLEY, Judge.

Dr. Jagjit S. Tandon (Doctor) appeals from the adjudication and order of the State Board of Medicine (board) affirming the adjudication and order of a hearing examiner which imposed a stayed three-year suspension of his license to practice medicine in Pennsylvania and a $1,000.00 civil penalty pursuant to the Medical Practice Act of 1985(Act).[1] We affirm.

The facts of this case may be summarized as follows. On May 17, 1995, while Doctor was practicing medicine in Tennessee, the Tennessee Board of Medical Examiners (Tennessee Board) issued a final order suspending Doctor's license to practice medicine in that state, and directing that he undergo a psychiatric examination. The Tennessee Board's order was based on its determination that Doctor engaged in "unprofessional, dishonorable or unethical" conduct under the Tennessee Medical Practice Act.

The Tennessee Board found that in April of 1994, Doctor restrained a female insurance agent in his office, kissed her on both cheeks and her mouth, unzipped her dress, pulled at her bra and bit her breast. The Tennessee Board also found that in May of 1994, Doctor kissed his pregnant receptionist and rubbed his hands over the clothing covering her breasts.

On July 19, 1995, the Tennessee Board issued a second order reinstating Doctor's license to practice medicine in that state and allowing him to voluntarily retire his license forthwith, provided that he personally appear before the Tennessee Board before reactivating his Tennessee license.

In August of 1995, Doctor moved to Pennsylvania, reactivated his license to practice medicine in Pennsylvania, and began to practice as an oncologist on the staff of St. Mary's Regional Medical Center. Doctor is the only oncologist on staff at St. Mary's and is currently treating approximately 170 patients per month with cancer or blood disorders.

On February 27, 1996, the "Probable Cause Screening Committee" of the board issued an order temporarily suspending Doctor's Pennsylvania license pursuant to section 40(a) of the Act[2] based on the Tennessee Board's orders. On May 1, 1996, following a

1. Act of December 20, 1985, P.L. 457, *as amended*, 63 P.S. §§ 422.1—422.45.

2. Section 40(a) of the Act provides, in pertinent part:

§ 422.40. **Temporary and automatic suspensions**

(a) **Temporary suspensions.**—A license or certificate issued under this act may be temporarily suspended under circumstances as determined by the board to be an immediate and clear danger to the public health and safety. The board shall issue an order to that effect without a hearing, but upon due notice, to the licensee or certificate holder concerned at his or her last known address, which shall include a written statement of all allegations against the licensee or certificate holder.... The board shall thereupon commence formal action to suspend, revoke or restrict the license or certificate of the person concerned as otherwise provided for in this act. All actions shall be taken promptly and without delay. Within 30 days following the issuance of an order temporarily suspending a license, the board shall conduct or cause to be conducted a preliminary hearing to determine that there is a prima facie case supporting the suspension. The licensee or certificate holder whose license or certificate has been temporarily suspended may be present at the preliminary hearing and may be represented by counsel, cross-examine witnesses, inspect physical evidence, call witnesses, offer evidence and testimony and make a record of the proceedings. If it is determined that there is not a prima facie case, the suspended license shall be immediately restored. The temporary suspension shall remain in effect until vacated by the board, but in no event longer than 180 days.
63 P.S. § 422.40(a).

preliminary hearing before a hearing examiner, the board vacated the temporary suspension based on its determination that Doctor's misconduct did not present an immediate danger to the public.

On May 9, 1996, a prosecuting attorney with the Pennsylvania Bureau of Professional and Occupational Affairs (bureau) filed a notice and order to show cause charging Doctor with violating section 41(4) of the Act [3] based on the discipline imposed by the Tennessee Board. On September 5, 1996, a hearing on the notice and order to show cause was conducted before a hearing examiner. On September 6, 1996, the hearing examiner issued an adjudication and order finding that Doctor violated section 41(4) of the Act by reason of the disciplinary action taken against him by the Tennessee Board. Pursuant to section 42 of the Act [4], the hearing examiner imposed a three-year suspension of Doctor's license retroactive to February 27, 1996, with all but the period from February 27, 1996 to March 26, 1996 stayed. The hearing examiner also imposed a $1,000.00 civil penalty.

On October 1, 1996, Doctor filed an application for review of the hearing examiner's adjudication and order with the board. In October of 1996, both Doctor and the Commonwealth filed briefs with the board in support of their respective positions regarding his application for review. On January 30, 1997, the board issued an adjudication and order affirming the hearing examiner's adjudication and order. Doctor then filed the instant appeal in this court.

In this appeal Doctor claims: [5] (1) the board erred in affirming the hearing examiner's adjudication and order as the imposition of discipline by the Pennsylvania board based on, and following, the discipline imposed by the Tennessee Board violates his rights as guaranteed by the Double Jeopardy Clauses of the United States and Pennsylvania Constitutions; (2) the board erred in affirming the hearing examiner's adjudication and order as no evidence was presented to demonstrate harm to any patients or the potential for such harm, and the events underlying the disciplinary action were remote in time; (3) the discipline imposed by the board was excessively harsh, unreasonable, arbitrary and capricious thereby constituting an abuse of discretion; and (4) the board erred in failing to adopt the findings of the Tennessee Board, disregarded binding legal conclusions that the incidents were remote in time and did not involve patient care, and improperly reimposed the initial period of suspension imposed under section 40(a) of the Act which had been previously vacated.

We initially note that, on appeal, this court's scope of review of the board's order is limited to a determination of whether constitutional rights were violated, an error of law was committed or whether

---

3. Section 41(4) of the Act provides:

§ 422.41. **Reasons for refusal, revocation, suspension or other corrective actions against a licensee or certificate holder**
The board shall have authority to impose disciplinary or corrective measures on a board-regulated practitioner for any or all of the following reasons:

 \* \* \*

(4) Having a license or other authorization to practice the profession revoked or suspended or having other disciplinary action taken, or an application for a license or other authorization refused, revoked or suspended by a proper licensing authority of another state, territory, possession or country, or a branch of the Federal Government.
63 P.S. § 422.41(4).

4. Section 42 of the Act provides, in pertinent part:

§ 422.42. **Types of corrective action**
(a) **Authorized actions.**—When the board is empowered to take disciplinary or corrective action against a board-regulated practitioner under the provisions of this act or pursuant to other statutory authority, the board may:

 \* \* \*

(2) Administer a public reprimand with or without probation.
(3) Revoke, suspend, limit or otherwise restrict a license or certificate.
(4) Require the board-regulated practitioner to submit to the care, counseling or treatment of a physician or a psychologist designated by the board.
(5) Require the board-regulated practitioner to take refresher educational courses.
(6) Stay enforcement of any suspension, other than that imposed in accordance with section 40, and place a board-regulated practitioner on probation with the right to vacate the probationary order for noncompliance.
(7) Impose a monetary penalty in accordance with this act.
63 P.S. § 422.42(a).

5. In the interest of clarity, we reorder the claims raised by Doctor in this appeal.

necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704; *Barran v. State Board of Medicine,* 670 A.2d 765 (Pa.Cmwlth.1996), *petition for allowance of appeal denied,* 544 Pa. 685, 679 A.2d 230 (1996). When reviewing a decision of the board, this court may not reweigh the evidence presented or judge the credibility of witnesses. *Id.* Thus, as the ultimate finder of fact, the board may accept or reject the testimony of any witness in whole or in part, and this court is bound by the credibility determinations made by the board. *Id.*

### ISSUE I

■ In this appeal, Doctor first claims that the board erred in affirming the hearing examiner's adjudication and order as the imposition of discipline by the board based on, and following, the discipline imposed by the Tennessee Board violates his rights as guaranteed by the Double Jeopardy Clauses of the United States and Pennsylvania Constitutions.

■ The Fifth Amendment to the United States Constitution provides, in pertinent part, "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Likewise, Article 1, Section 10 of the Pennsylvania Constitution provides, in pertinent part, "[n]o person shall, for the same offense, be twice put in jeopardy of life or limb ..." Pa. Const. art. 1, § 10.[6]

As the United States Supreme Court has stated:

> We have explained that 'the [Double Jeopardy] Clause serves the function of preventing both successive punishment and successive prosecution,' *United States v. Dixon,* 509 U.S. 688, 704, 113 S.Ct. 2849 [2860], 125 L.Ed.2d 556 (1993) (citing *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969)), and that 'the Constitution was designed as much to prevent the criminal from being twice punished for the same offence as from being twice tried for it,' *Ex parte*

Lang [Lange], 18 Wall. 163, 173, 21 L.Ed. 872 (1874). See also *Schiro v. Farley,* 510 U.S. 222, 229, 114 S.Ct. 783, 789, 127 L.Ed.2d 47 (1994); *United States v. Halper,* 490 U.S. 435, 440, 451, n. 10, 109 S.Ct. 1892 [1903, n. 10], 104 L.Ed.2d 487 (1989). Significantly, the language of the Double Jeopardy Clause protects against more than the actual imposition of two punishments for the same offense; by its terms, it protects a criminal defendant from being *twice put in jeopardy* for such punishment. See *Price v. Georgia,* 398 U.S. 323, 326, 90 S.Ct. 1757 [1759–60], 26 L.Ed.2d 300 (1970). That is, the Double Jeopardy Clause 'prohibits merely punishing twice, or *attempting a second time to punish criminally,* for the same offense.' *Helvering v. Mitchell,* 303 U.S. 391, 399, 58 S.Ct. 630 [633], 82 L.Ed. 917 (1938).

*Witte v. United States,* 515 U.S. 389, 395–96, 115 S.Ct. 2199, 2204, 132 L.Ed.2d 351 (1995) (emphasis in original).

The Supreme Court has also noted that:

> This court many times has held that the Double Jeopardy Clause protects against three distinct abuses: a second prosecution for the same offense after acquittal; a second prosecution for the same offense after conviction; and multiple punishments for the same offense. See, e.g., [*Pearce* ]. The third of these protections—the one at issue here—has deep roots in our history and jurisprudence. As early as 1641, the Colony of Massachusetts in its 'Body of Liberties' stated: 'No man shall be twise sentenced by Civill Justice for one and the same Crime, offence, or Trespasse.' American Historical Documents 1000–1904, 43 Harvard Classics 66, 72 (C. Eliot ed.1910). In drafting his initial version of what came to be our Double Jeopardy Clause, James Madison focused explicitly on the issue of multiple punishment: 'No person shall be subject, except in cases of impeachment, to more than one punishment or one trial for the same offence.' 1 Annals of Cong 434 (1789–1791) (J. Gales ed 1834). In our case law, too, this court, over a century ago, observed: 'If there is

6. The protections afforded by the Double Jeopardy Clause of the Pennsylvania Constitution are coextensive with the rights guaranteed under the United States Constitution. *See, e.g., Common-* *wealth v. Lively,* 530 Pa. 464, 610 A.2d 7 (1992); *Commonwealth v. Kunish,* 529 Pa. 206, 602 A.2d 849 (1992).

anything settled in the jurisprudence of England and America, it is that no man can be twice lawfully punished for the same offence.' [*Ex parte Lange,* 18 Wall. at 168].

U.S. v. Halper, 490 U.S. 435, 440, 109 S.Ct. 1892, 1897, 104 L.Ed.2d 487.

■ Thus, as we noted in *Sweeny v. State Board of Funeral Directors,* 666 A.2d 1137, 1139 (Pa.Cmwlth.1995):

The double jeopardy clauses of both the United States and Pennsylvania Constitutions prohibit multiple punishments for the same offense. [*Pearce* ]; *Commonwealth v. Hogan,* 482 Pa. 333, 393 A.2d 1133 (1978). They do not, however, preclude the imposition of a civil penalty for conduct for which a criminal conviction has already been obtained. [*Helvering* ]; *L.W.B. v. Sosnowski,* 117 Pa.Cmwlth. 120, 543 A.2d 1241 (1988). As a general rule, the protection against double jeopardy does not apply in civil proceedings, such as those before administrative agencies, that result in civil penalties. *In re Friedman,* 72 Pa. Cmwlth. 274, 457 A.2d 983 (1983).

This distinction between civil and criminal penalties for purposes of double jeopardy has been expanded upon by the United States Supreme Court in [*Halper* ]. In *Halper,* the Supreme Court held that, in order to determine whether double jeopardy applied to administrative proceedings, one must look, not to the legislature's classification of the penalty as being civil or criminal, but instead, to the penalty imposed and the purposes that penalty may fairly be said to serve. *Id.* If the civil sanction can be characterized only as a deterrent or as punishment for the conduct in question, then double jeopardy would prevent the imposition of that sanction. *Id.*

■ Doctor argues that, under *Halper,* the board was precluded from suspending his license to practice medicine in Pennsylvania as he had been previously disciplined by the Tennessee Board for the same conduct. However, Doctor misconstrues the protections afforded by the Double Jeopardy Clauses of the United States and Pennsylvania Constitutions. These clauses protect an individual from twice being punished for *criminal* conduct. Indeed, as the United States Supreme Court stated in *Halper:*

We therefore hold that under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution.

*Id.,* 490 U.S. at 448–49, 109 S.Ct. at 1902.

In all of the cases cited by doctor in support of this proposition, the imposition of a civil penalty was either preceded by, or followed by, a criminal prosecution based on the same conduct. In this case, Doctor has never been charged with any crime, or "offense", based on the conduct which occurred in Tennessee and served as the basis for the disciplinary action taken by the Tennessee Board. As a result, the protections afforded under the Double Jeopardy Clauses are simply not applicable, and do not serve as a bar to the disciplinary action taken by the board in this case.[7]

---

7. Even if criminal conduct had been the basis for the disciplinary action taken in this case, it is doubtful that the Double Jeopardy Clauses would have precluded its imposition. *See, e.g., Schillerstrom v. Board of Chiropractic Examiners,* 180 Ariz. 468, 885 P.2d 156 (1994) (The Double Jeopardy Clause does not prevent the revocation of a chiropractic license for conduct which also gave rise to a criminal conviction for fraud); *Loui v. Board of Medical Examiners,* 78 Hawai'i 21, 889 P.2d 705 (1995) (The Double Jeopardy Clause does not prevent the 1–year suspension of a medical license for conduct which also gave rise to criminal convictions for attempted sexual abuse and kidnapping); *Alexander v. State Board of Medical Examiners,* 644 So.2d 238 (La.Ct.App. 1994) (The Double Jeopardy Clause does not prevent the 3–year suspension of a medical license for conduct which also gave rise to a criminal conviction for robbery); *State v. Wolf,* 250 Neb. 352, 549 N.W.2d 183 (1996) (The Double Jeopardy Clause does not prevent a prosecution for the crime of possession of a controlled substance for conduct which also gave rise to the revocation of a license to practice pharmacy). *But cf., Kvitka v. Board of Registration in Medicine,* 407 Mass. 140, 551 N.E.2d 915 (1990) (The Double Jeopardy Clause precluded the imposition of a civil penalty of $10,000 based on the same conduct which also resulted in guilty pleas to the crime of unlawfully dispensing controlled substances and resulted in the imposition of a suspended prison sentence and a $60,000 fine).

## ISSUE II

Doctor next claims that the board erred in affirming the hearing examiner's adjudication and order because: (1) no evidence was presented to demonstrate harm to any patients or the potential for such harm; and (2) the events underlying the disciplinary action in Tennessee were remote in time.

■ As noted above, the instant disciplinary proceedings were initiated under section 41(4) of the Act. As we stated in *Johnston v. State Board of Medical Education and Licensure*, 49 Pa.Cmwlth. 9, 410 A.2d 103, 105 (1980):

Statutes regulating the practice of medicine and its branches are to safeguard the public health and welfare and such regulatory measures if not unreasonable or arbitrary constitute a proper exercise of the police power.

We hold that the Legislature's authorization of suspension or revocation following disciplinary action taken by another state against a holder of a Pennsylvania license found in [the prior version of section 41(4)] is neither unreasonable nor arbitrary and constitutes a valid exercise of the statute's police power. Because the Pennsylvania Board has no real independent ability to monitor the performance of Pennsylvania-licensed physicians who conduct their practices out-of-state, we view the authority of the Pennsylvania Board to act swiftly upon official verification of disciplinary action in another state as most salutary.

■ In addition, in *Johnston* we noted that:

Since the Pennsylvania Board is acting on the *fact* of disciplinary action in another state [in a proceeding initiated under prior version of section 41(4) of the Act,] rather than the underlying events leading to that action, the substance of the charges and the procedure utilized in their resolution must, for purposes of [the prior version of section 41(4)], be considered immaterial.

*Id.*, 410 A.2d at 106 (emphasis in original).

■ Doctor first argues that because no evidence was presented in the Pennsylvania proceedings which demonstrated patient harm or the potential for such harm, the board erred in imposing the disciplinary sanctions in this case. However, as noted above, in the instant proceeding under section 41(4) of the Act, the board was permitted to act solely on the fact that Doctor had been disciplined by a board in another jurisdiction. *Johnston. See also Shoenhair v. State, Board of Nurse Examiners*, 74 Pa. Cmwlth. 217, 459 A.2d 877 (1983) (An individual's nursing license may be revoked solely on the basis of a license revocation issued by another state's licensing authority). Thus, the only evidence which was required to support the board's actions in this case was evidence that Doctor was disciplined by the board in Tennessee. *Johnston.* The substance of the charges underlying the actions which took place in Tennessee, and the procedure utilized in their resolution, were completely immaterial to the proceedings before the Pennsylvania Board. *Id.* As a result, no evidence of patient harm or the potential for such harm was required to support the action taken by the board in this case. *Id.*

■ Doctor next argues that the board erred in imposing the instant sanctions because the events underlying the proceedings in Tennessee were remote in time. However, as stated above, the events underlying the proceedings in Tennessee were immaterial to the instant proceedings initiated in Pennsylvania under section 41(4) of the Act. *Johnston.* The only relevant inquiry in the instant proceedings was whether Doctor had been disciplined by the board in Tennessee. *Id.* As we noted in *DeMarco v. State Board of Medical Education and Licensure*, 47 Pa.Cmwlth. 500, 408 A.2d 572, 575 (1979), "... [the] unprofessional conduct [of a doctor] or loss of professional status [in another jurisdiction] before commencing practice in Pennsylvania is clearly relevant to continued qualification here, except where such conduct or loss has been extremely remote in time...." In this case, the proceedings under section 41(4) of the Act were initiated within 9 months after Doctor returned to Pennsylvania and reactivated his Pennsylvania license, and within 1 year after the Tennessee Board issued its initial order suspending Doctor's license to practice in that state. Clearly, the action underlying the instant action, i.e., Doctor's loss of professional sta-

tus in Tennessee, was not remote in time. *DeMarco.*

### ISSUE III

 Doctor next claims that the discipline imposed by the board is excessively harsh, unreasonable, arbitrary and capricious thereby constituting an abuse of discretion.

 As the Pennsylvania Supreme Court has noted, "[i]n the absence of bad faith, fraud, capricious action or abuse of power, reviewing courts will not inquire into the wisdom of [an administrative] agency's action or into the details or manner of executing agency action." *Slawek v. State Board of Medical Education and Licensure*, 526 Pa. 316, 322, 586 A.2d 362, 365 (1991). Thus, as there is no allegation of fraud or bad faith in this case, "our inquiry in this case resolves itself into whether the [board]'s action was capricious or a flagrant abuse of discretion. *Id.*

In issuing his order suspending Doctor's license and imposing the $1,000 fine in this case, the hearing examiner stated the following in his adjudication:

[Doctor]'s conduct which gave rise to the Tennessee action is so, in the words of the Tennessee board, 'dishonorable' that a period of suspension is appropriate to demonstrate the Board's disapproval of such conduct. However, the evidence presented at the hearing is that any further active suspension of [Doctor]'s license would pose such distress and hardship to his patients who are already suffering from a terrible disease as to outweigh the appropriate punitive value of such a sanction.

Hearing Examiner Adjudication, p. 9 (footnote omitted). Thus, the hearing examiner determined that it was appropriate to issue a three-year suspension of Doctor's license, and stay all of the suspension except for a one-month period which Doctor had already served.

In affirming the hearing examiner's determination, the board stated the following:

The question remaining then is the appropriateness of the sanction. Upon review of the record, the Board concludes that the Hearing Examiner's view of the matter is correct. The Board agrees with the Hearing Examiner's assessment that the con-

duct [Doctor] engaged in while in Tennessee was dishonorable. [Doctor]'s restraint and abuse of women in his office warrants some disciplinary action regardless of the fact that the women were not patients. Had they been patients, [Doctor]'s conduct would warrant severe action. The Hearing Examiner's decision to impose a three-year suspension, with all but the period from February 27, 1996 to March 26, 1996, stayed, was in many ways generous to Doctor. However, in light of the patient service reasons described by the Hearing Examiner [in] his Adjudication and Order, the Board is inclined to accept the Hearing Examiner's determination.

Board Adjudication and Order, pp. 4–5 (footnote omitted).

Thus, the board determined that although doctor must be disciplined for his egregious conduct in Tennessee, the board determined that the discipline imposed should be lenient in the interest of doctor's patients. In sum, "[i]t is self-evident that the board's decision was not capricious or a flagrant abuse of discretion, and it is not for this court or any reviewing court to substitute its judgment of what is reasonable for that of the agency whose decision is being reviewed." *Slawek*, 526 Pa. at 323–24, 586 A.2d at 366.

### ISSUE IV

Finally, Doctor claims that the board erred in: (1) failing to adopt the findings of the Tennessee Board that no further disciplinary action was necessary and that Doctor did not present a threat of harm to patients or the public as they constituted the "law of the case"; and (2) improperly reimposed the temporary period of suspension imposed under section 40(a) of the Act.

In the former claim, Doctor argues that under the doctrines of "law of the case" and collateral estoppel, the Pennsylvania board was bound by the Tennessee Board's determinations that Doctor did not present a threat of harm to patients or the general public, and that no further disciplinary action was necessary against Doctor for the protection of the health, safety and welfare of the public. However, Doctor erroneously relies on theses doctrines in support of his claim.

As the Pennsylvania Superior Court has noted, "[t]he 'law of the case' doctrine prohibits an appellate court from revisiting an issue that has been decided in an earlier appeal in the same case between the same parties." *Benson v. Benson*, 425 Pa. Superior Ct. 215, 220, 624 A.2d 644, 647 (1993), *petition for allowance of appeal denied*, 536 Pa. 637, 639 A.2d 22 (1994). That is:

'Law of the case means that whatever is once irrevocably established as the *controlling legal rule of decision* between the same parties in the same case continues to be the law of the case.' *Banker v. Valley Forge Ins. Co.*, 401 Pa.Super. 367, 374, 585 A.2d 504, 508 (1991) (citations omitted, emphasis supplied). The doctrine of 'law of the case' applies only if the parties on the two appeals are the same. Issues decided by an appellate court on a prior appeal between the same parties become the law of the case and will not be considered on appeal. *Id.*

*Tyro Industries, Inc. v. James A. Wood, Inc.*, 418 Pa. Superior Ct. 296, 305, 614 A.2d 279, 284 (1992).

In this case, the board was not a party to the proceedings in Tennessee, and the findings that Doctor claims are binding were not made by an appellate court in those proceedings. As a result, the "law of the case" doctrine is clearly inapplicable to bind the board to the findings made by the Tennessee Board.

In addition, as we have previously noted:

The doctrine of collateral estoppel or issue preclusion serves to prevent a party to an earlier proceeding where an issue has been decided from attempting to relitigate that precise issue in later proceedings with the same parties. It is only applicable when:

(1) The issued decided in an earlier case is identical to that presented in the later action;

(2) There was a final judgment on the merits in the earlier action and the issue decided was essential to that judgment;

(3) The party against whom the estoppel claim is asserted was a party or in privity with a party in the earlier adjudication; and

(4) The party against whom the estoppel is claimed had a full and fair opportunity to litigate the issue in the prior action.

In addition to these four traditional elements, when the issue at hand has been decided in two different tribunals, the second tribunal will only be bound by the first tribunal if the two have equivalent subject matter jurisdiction.

*In re Appeal of Davis*, 165 Pa.Cmwlth. 20, 644 A.2d 220, 222 (1994).

In this case, the board was not a party to the proceedings in Tennessee. More importantly, however, the issue in the proceedings before the board was different from that considered by the Tennessee Board. The issue determined in the Tennessee proceedings was whether or not Doctor engaged in "unprofessional, dishonorable or unethical conduct" as those terms are defined in the Tennessee Medical Practice Act. The issue determined by the board in this case was limited solely to whether or not Doctor had been disciplined by the Tennessee Board. As noted above, the substance of the charges in the Tennessee proceedings and the procedure utilized in their resolution were immaterial to the instant proceedings before the board. *Johnston*. Thus, the doctrine of collateral estoppel is facially inapplicable in this case as well.

Moreover, as we noted in *Johnston*:

The potential clash between the interests of persons engaged in a profession like medicine and those of members of the public who rely on the expertise of such professionals as embodied in the state-issued license was recognized nearly a century ago by Justice Field of the United States Supreme Court:

'It is undoubtedly the right of every citizen of the United States to follow any lawful calling, business or profession he may choose.... The interest ... [in] continu[ing] their prosecution, is often of great value to the possessors, and cannot be arbitrarily taken from them, anymore than their real or personal property can be thus taken. But there is no

arbitrary deprivation of such right where its exercise is not permitted because of a failure to comply with conditions imposed by the State for the protection of society. The power of the State to provide for the general welfare of its people authorizes it to prescribe all such regulations as, in its judgment, will secure or tend to secure them against the consequences of ignorance and incapacity, as well as of deception and fraud.'

*Dent v. West Virginia,* 129 U.S. 114, 121–22, 9 S.Ct. 231, 233, 32 L.Ed. 623 (1889).

More recently that Court observed the broad extent of state power in this area:

'It is elemental that a state has broad power to establish and enforce standards of conduct within its borders relative to the health of everyone there. It is a vital part of a state's police power. The state's discretion in that field extends naturally to the regulation of all professions concerned with health.'

*Brasky [Barsky] v. Board of Regents,* 347 U.S. 442, 449, 74 S.Ct. 650, 654, 98 L.Ed. 829 (1954).

*Johnston,* 410 A.2d at 105.[8]

 Thus, the board is the agency charged with the authority and responsibility to oversee those engaging in the medical profession within this Commonwealth, and to determine the competency and fitness of an applicant to practice medicine here. *Barran.* The authority of the Commonwealth to regulate those engaging in this profession is inherent as a sovereign state, and it is a valid exercise of its police power. *Barsky; Dent, Watson; Johnston.* Likewise, Tennessee, as a sovereign state, is free to regulate the practice of medicine within its borders as a valid exercise of its police power. However, Pennsylvania is in no way *required* to accede to any determination by the State of Tennessee regarding Doctor's fitness to practice medicine within that state. It is for Pennsyl-

vania, and Pennsylvania alone, to determine the fitness of an individual to practice medicine within this Commonwealth. *See, e.g., The Florida Bar v. Wilkes,* 179 So.2d 193 (Fla.1965) (Neither the Full Faith and Credit Clause of the Federal Constitution nor comity required that a judgment of disbarment in New York result in disbarment in Florida). *See also In the Matter of McCabe,* 411 Mass. 436, 583 N.E.2d 233 (1991); *Kentucky Bar Association v. Signer,* 533 S.W.2d 534 (Ky. 1976); *In re Weiner,* 530 S.W.2d 222, (Mo. 1975). As a result, the board was not bound by the Tennessee board's determinations that Doctor did not present a threat of harm to patients or the public, or that no further disciplinary action was necessary.

Regarding Doctor's latter claim that the board erred in reimposing a portion of the initial suspension imposed under section 40(a) of the Act, it is clear that the board committed no error in this regard. The three-year period of suspension imposed by the board in this case was based solely on the violation of section 41(4) of the Act. Such a disciplinary measure is specifically authorized by section 42 of the Act. It is clear that by staying all of the suspension, except for one month which the Doctor had already served under the initial temporary suspension, the board was, in its own words, "in many ways generous to [Doctor]." Board Adjudication, p. 5.

Accordingly, the order of the board is affirmed.

### ORDER

NOW, this 10th day of December, 1997, the order of the State Board of Medicine, dated January 30, 1997, at No. 0345–49–96, is affirmed.

---

**8.** *See also Watson v. State of Maryland,* 218 U.S. 173, 176, 30 S.Ct. 644, 646, 54 L.Ed. 987 (1910) wherein the United States Supreme Court stated:

It is too well settled to require discussion at this day that the police power of the States extends to the regulation of certain trades and callings, particularly those which closely concern the public health. There is perhaps no profession more properly open to such regulation than

that which embraces the practitioners of medicine. Dealing, as its followers do, with the lives and health of the people, and requiring for its successful practice general education and technical skill, as well as good character, it is obviously one of those vocations where the power of the State may be exerted to see that only properly qualified persons shall undertake its responsible and difficult duties.