COURT OF APPEALS OF VIRGINIA

Present: Judges Causey, Friedman and Senior Judge Clements
Argued at Richmond, Virginia

RAY W. METTETAL, JR., M.D.

|                              | OPINION BY                          |
| v.   Record No. 1142-23-2    | JUDGE JEAN HARRISON CLEMENTS        |
|                              | DECEMBER 30, 2024                   |

VIRGINIA BOARD OF MEDICINE

FROM THE CIRCUIT COURT OF HENRICO COUNTY
Rondelle D. Herman, Judge

Gregory Brown (Robert Harrison Gibbs, Jr.; Elizabeth Dahl
Coleman; Lowe Yeager & Brown PLLC; Goodman Allen Donnelly,
on briefs), for appellant.

M. Brent Saunders, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General; Robert B. Bell, Deputy Attorney
General; Allyson K. Tysinger, Senior Assistant Attorney General, on
brief), for appellee.


Ray W. Mettetal, Jr., M.D., appeals the circuit court's order upholding the Department of

Health Professions' Board of Medicine's decision to revoke his license to practice medicine in

Virginia. Mettetal, who practiced exclusively in Tennessee during the relevant period, contends

that the Board lacked jurisdiction to investigate and discipline him for his conduct outside of

Virginia. He also asserts that the Board improperly relied on evidence he claims the Board

obtained in violation of federal regulations. Finally, he argues that the Board's disciplinary

decision was unsupported by substantial evidence. We affirm.

BACKGROUND

On appeal, we view the evidence in the light most favorable to the Board, the prevailing

party below. *Chabolla v. Va. Dep't of Soc. Servs.*, 55 Va. App. 531, 534 (2010). We "limit our

review of issues of fact to the agency record." *Mulvey v. Jones*, 41 Va. App. 600, 602 (2003).

Mettetal is licensed to practice medicine in Tennessee and Virginia. Between September 2011 and October 2016, he worked as an independent contractor at Watauga Recovery Center, a substance abuse treatment facility in Abingdon, Virginia. He opened his own substance abuse clinic in Tennessee in February 2015. Between February 2015 and October 2016, Mettetal alternated between Watauga and his Tennessee clinic, after which he began practicing full time in Tennessee. The Tennessee Department of Mental Health and Substance Abuse Services regularly inspected Mettetal's clinic and repeatedly renewed his license to operate a substance abuse clinic.

The Board has promulgated various regulations governing the prescribing of opioids and buprenorphine. 18 VAC 85-21-10 through 18 VAC 85-21-170. For example, practitioners must either provide substance misuse counseling or refer the patient to a mental health service provider who is qualified to do so and must document that counseling or referral in the record. 18 VAC 85-21-130(D). The counseling must "incorporate relapse prevention strategies." 18 VAC 85-21-150(J). The practitioner must also perform and document "an assessment that includes a comprehensive medical and psychiatric history, substance misuse history and psychosocial supports," a physical examination, "urine drug screen, pregnancy test for women of childbearing age and ability," and a "check of the Prescription Monitoring Program [(PMP)]."[1] 18 VAC 85-21-140(A). And he must establish a treatment plan that includes "the practitioner's rationale for selecting medication-assisted treatment, patient education, written informed

---

[1] The PMP is the "electronic system within the Department of Health Professions that monitors the dispensing of certain controlled substances." 18 VAC 85-21-20; *see also* Code § 54.1-2520(A) (requiring the creation of such a system). The PMP covers "practitioner[s] licensed in Virginia and authorized to issue a prescription for a controlled substance" or a practitioner "licensed in another state to so issue a prescription for a covered substance." Code § 54.1-2519. When a practitioner prescribes a covered substance, he must report the recipient's information, the substance and quantity prescribed, and the date of the dispensing. Code § 54.1-2521(B). Failure to comply "shall constitute grounds for disciplinary action by the relevant health regulatory board." Code § 54.1-2521(A).

consent, how counseling will be accomplished," and a "signed treatment agreement that outlines the responsibilities of the patient and the prescriber." 18 VAC 85-21-140(B). The practitioner must assess the progress of patients with chronic pain "by reduction of pain and functional objectives that can be identified, quantified, and independently verified." 18 VAC 85-21-160(C). The medical records for opioid addiction treatment must be "timely, accurate, legible, complete, and readily accessible for review." 18 VAC 85-21-170(A).

The regulations also provide that "[d]ue to a higher risk of fatal overdose when buprenorphine is prescribed with other opioids [or] benzodiazepines," a practitioner may prescribe those substances together only "when there are extenuating circumstances and shall document in the medical record a tapering plan to achieve the lowest possible effective doses." 18 VAC 85-21-150(D). A practitioner prescribing more than 16mg of buprenorphine per day must document the rationale for doing so. 18 VAC 85-21-150(I).

In September 2017, Ashley Harrell, an employee of the Virginia Department of Medical Assistance Services (DMAS), filed a complaint with the Virginia Board of Medicine against Mettetal. According to Harrell, DMAS had "received concerns" that Mettetal was not following the Board's regulations on prescribing buprenorphine for addiction. Harrell included no patient information in the complaint. A Department of Health Professions investigator, Amy Tanner, subsequently obtained Mettetal's patient information from Virginia's PMP database for five Virginia residents (patients A-E) who received treatment from Mettetal in Tennessee.

Tanner also asked Mettetal to provide complete medical records for patients A-E. Mettetal initially provided treatment notes for only the most recent visit for each patient. Although he claimed those records were complete, he faxed more records for patients A-E the next month. At Tanner's request, Mettetal later provided medical records for patient F, a Tennessee resident whom Mettetal treated in Tennessee.

Mettetal told Tanner that he had provided all medical records for patients A-F in his possession. Those records, however, contained substantial gaps. Mettetal's treatment notes established that, as of December 2017, patients A-F had each seen Mettetal for treatment between 8 and 16 times. But Mettetal provided treatment notes for only three visits from patient C; two visits from patients A, B, and E; and only one visit from patients D and F. The treatment notes were broken down into sections, such as "chief complaint," "history of present illness," and "physical examinations." The history of present illness section contained information for prior visits but the other sections did not, making it difficult to determine, for example, what physical examination, if any, Mettetal performed at each visit.

In September 2020, the Board sent a notice of informal conference and statement of allegations to Mettetal, alleging misconduct in his treatment of patients A-F. After the informal conference, the matter was referred to the full Board for a formal hearing. Before that hearing, Mettetal moved *pro se* to dismiss the allegations, arguing that the Board lacked jurisdiction to discipline him for conduct that occurred entirely in Tennessee. The Board rejected that argument, concluding that it had jurisdiction to discipline all doctors licensed under its authority. Mettetal also argued that the Board violated federal regulations by obtaining patient records from the PMP database without the patients' consent. Other than concluding that Mettetal's "legal arguments put forth in support of his motion [were] erroneous," the Board did not address his federal regulations argument.

Mettetal provided the Board with the missing treatment notes shortly before the formal hearing. The Board held that hearing in October 2021, at which the evidence demonstrated the following. Patients A-F each signed a buprenorphine treatment agreement with Mettetal. Those agreements advised that mixing buprenorphine with other medications, especially benzodiazepines such as Valium, Klonopin, or Xanax, or exceeding the dose prescribed by

- 4 -

Mettetal, could be dangerous and even fatal. The patients also agreed to abstain from using alcohol, marijuana, cocaine, and other addictive substances; not to sell, share, or give their medication to any other person; not to obtain medication from other doctors without telling Mettetal; to take their medication as instructed; and to submit to random drug screens. They acknowledged that failure to comply with those terms could "be grounds for termination of [their] treatment."

Mettetal treated patient A at Watauga in Abingdon "for years" before treating him in Tennessee. Patient A's chief complaint was opiate addiction. Although patient A listed a primary care physician on his patient intake form, none of Mettetal's records reflect that Mettetal tried to consult that physician. According to PMP records obtained in January 2018, Mettetal prescribed buprenorphine and naloxone to patient A monthly from January 2016 through January 2018. Patient A, however, did not sign a buprenorphine treatment agreement until November 2016. Mettetal prescribed patient A 8mg buprenorphine tablets and 2mg of naloxone to be taken three times per day. He also prescribed clonazepam monthly beginning in February 2016 and gabapentin beginning in March 2017.[2] Patient A tested positive for THC in October, November, and December 2017, and January 2018. Mettetal's treatment notes did not indicate that Mettetal discussed those positive drug screens with patient A or otherwise altered patient A's treatment.

Mettetal also began treating patient B for opiate addiction while at Watauga. Mettetal prescribed suboxone and clonazepam to patient B monthly from January 2016 through January

---

[2] Buprenorphine is an opiate, clonazepam is a benzodiazepine sold under the brand name of Klonopin, and gabapentin is an anticonvulsant medication.

2018.[3]  Patient B did not sign a treatment agreement until November 2017.  As with patient A, Mettetal prescribed that patient B take three 8mg buprenorphine tablets per day.  While Mettetal was treating patient B, other providers prescribed gabapentin to patient B.  Mettetal's records do not reveal whether Mettetal consulted those other providers.  From January 2017 to January 2018, patient B tested positive for THC 11 times, ethyl sulfate 5 times, and non-prescribed alprazolam 3 times.[4]  Mettetal wrote in his treatment notes that he increased patient B's Klonopin prescription in May 2017 "as a bargain" for patient B discontinuing his THC use.[5]  Yet patient B tested negative for clonazepam on all 13 drug screens from January 2017 through December 2017.[6]  The treatment notes do not reflect that Mettetal discussed those negative tests with patient B, and he continued to prescribe clonazepam after each negative test.[7]

Mettetal began treating patient C for opiate addiction at Watauga.  Other providers prescribed clonazepam, suboxone, and gabapentin to patient C from January 2016 through May 2017.  The records do not indicate that Mettetal consulted those providers.  Patient C signed a treatment agreement with Mettetal in June 2017.  Mettetal prescribed patient C suboxone

---

[3] PMP records identify the drug as suboxone, which contains buprenorphine and naloxone.  Mettetal's notes and a January 2018 prescription note he provided identify the drug as 8mg of buprenorphine and 2mg of naloxone, the same combination he prescribed to patient A.

[4] Alprazolam is the generic name of Xanax, a benzodiazepine.

[5] Patient B tested negative for THC at the drug screen following the "bargain" but continued to test positive thereafter.

[6] Mettetal testified that the metabolite for clonazepam was usually present in patient B's drug screens, indicating that patient B was taking the medication, even if not on schedule.  According to the medical records Mettetal provided, however, the metabolite was detected only once, in January 2018.

[7] Mettetal testified that he told patient B that he would end the treating relationship if patient B continued to take non-prescribed alprazolam.  The treatment notes do not document that discussion.

approximately monthly from June 2017 through November 2017.  He prescribed gabapentin and clonazepam approximately monthly beginning in June 2017.

Mettetal testified that if he did not prescribe clonazepam, patient C "would have just bought it off the street."  He claimed that it was better for his patient to use his prescriptions because they were safer and legal.  Yet patient C also regularly tested negative for clonazepam and gabapentin.  Moreover, between March 2016 and November 2017, patient C tested positive for THC nine times, non-prescribed oxycodone three times, Adderall twice, and Tramadol once.  The treatment notes acknowledged patient C's frequent THC use and document that patient C admitted to using Percocet and oxycodone without a prescription.  But the notes did not document Mettetal's response to those admissions and drug screens.

Mettetal first saw patient D for opiate addiction in Tennessee in December 2016.  She dated her treatment agreement December 2017, but Mettetal testified that Patient D had written the wrong date and that she signed the agreement in December 2016.  Other providers prescribed patient D alprazolam and hydrocodone acetaminophen before Mettetal's treatment, but the record is silent as to whether Mettetal consulted those physicians.  Mettetal prescribed patient D suboxone and clonazepam approximately monthly from December 2016 through December 2017.  He also prescribed gabapentin from April 2017 through November 2017.  Patient D tested negative for clonazepam in 8 out of 12 visits from December 2016 through November 2017.  She tested positive for gabapentin four times before Mettetal started prescribing that drug but tested negative in six out of eight visits thereafter.  The treatment notes do not reflect any discussion or response by Mettetal to those drug screens.

Mettetal first treated patient E for opiate addiction in Tennessee in February 2017, and patient E signed a treatment agreement that month.  Mettetal prescribed patient E clonazepam and buprenorphine approximately monthly from February 2017 through December 2017.  He

prescribed gabapentin from April 2017 through December 2017. Patient E was also prescribed gabapentin and hydrocodone acetaminophen from other providers both before and during Mettetal's treatment. The treatment records do not reflect any consultation between Mettetal and those providers. Patient E tested negative for clonazepam in March, May, June, and July 2017. Mettetal's treatment notes do not document any discussion of those negative tests or a discontinuation of clonazepam.

Finally, Mettetal began treating patient F for opiate addiction in Tennessee in June 2016, and patient F signed a treatment agreement that month.[8] Mettetal prescribed Adderall and clonazepam to patient F. During Mettetal's treatment, patient F also received other controlled substances from other providers, but there is no record of Mettetal consulting those providers. Patient F tested positive for hydrocodone, morphine, lorazepam, methamphetamine, and methadone. She also had metabolites that were consistent with diazepam, the generic name of the benzodiazepine Valium. She tested negative for clonazepam on the only drug screen contained in the record.

Tanner interviewed Mettetal twice during her investigation. Mettetal told Tanner that his physical examinations were "mostly observational and hands off." When Tanner asked whether Mettetal communicated with other doctors, he responded, "There's no communication between doctors" and explained that he relied on information the patients provided. He later testified at the formal hearing that he routinely sent record requests to his patients' prior physicians but never received a response. He also testified that he discussed the concerning drug screens with his patients and "probably should have written a sentence or two on [those] discussions."

---

[8] Because patient F is not a Virginia resident, the record does not contain information from Virginia's PMP database.

- 8 -

In October 2021, the Board issued its factual findings and legal conclusions.  The Board found that Mettetal had:

- Failed to perform adequate physical examinations of patients A-F;

- Failed to consult with other treatment providers or obtain treatment records for patients A-F;

- Failed to address concerning drug screens for patients A-F;

- Prescribed buprenorphine to patients A, B, and D before executing a treatment agreement;

- Failed to provide or refer patients A-F for substance misuse counseling and relapse strategies;

- Failed to justify co-prescribing buprenorphine and clonazepam to patients A-F or document a tapering plan;

- Failed to document his rationale for prescribing buprenorphine above 16mg per day to patients A, B, D, and E;

- Failed to adequately assess patients A-E's chronic pain; and

- Failed to keep complete medical records for patients A-F readily accessible.[9]

The Board concluded that Mettetal's actions amounted to professional misconduct under Code § 54.1-2915.  Accordingly, the Board placed Mettetal's license on indefinite probation.

Mettetal appealed to the circuit court, arguing that the Board acted without jurisdiction and that its decision was arbitrary and capricious.  Mettetal later filed a memorandum in support of his petition in which he asserted that the Board had violated federal regulations by obtaining and relying on confidential patient records without patient consent or a court order.

---

[9] The Board also found that Mettetal failed to treat patients A-E at least once a week during the "induction phase" but later conceded to the circuit court that that finding was unsupported by substantial evidence.

After a hearing, the circuit court upheld the Board's decision. The court did not address Mettetal's argument that the Board had violated federal regulations but restricted its ruling to the assignments of error outlined in Mettetal's petition. The court found that Mettetal had waived his argument that the Board lacked jurisdiction to investigate him. The court also found that, to the extent Mettetal had preserved that argument, Harrell was a member of the "general public" and the Board had jurisdiction to investigate complaints received from the general public. Finally, the court found that the Board had jurisdiction to discipline Mettetal for conduct committed in Tennessee and that substantial evidence supported the Board's decision to do so.[10] This appeal follows.

## ANALYSIS

### I. The Board had jurisdiction to investigate Mettetal's conduct.

"The Department shall investigate all complaints that are within the jurisdiction of the relevant health regulatory board received from (i) the general public and (ii) all reports received pursuant to" various statutes that are not at issue here. Code § 54.1-2506.01. Mettetal argues that the Board lacked jurisdiction to investigate Harrell's complaint because Harrell was not a member of "the general public." That argument is unavailing.[11]

We review issues of statutory interpretation de novo. *VACORP v. Young*, 298 Va. 490, 494 (2020). "The 'primary objective of statutory construction is to ascertain and give effect to legislative intent.'" *Grethen v. Robinson*, 294 Va. 392, 397 (2017) (quoting *Turner v. Commonwealth*, 226 Va. 456, 459 (1983)). We determine that intent "from the plain meaning of

---

[10] The circuit court struck the "induction phase" finding because the Board conceded it was unsupported by substantial evidence.

[11] The circuit court found that Mettetal had waived this argument by not presenting it to the Board but nonetheless addressed the argument on the merits. We assume without deciding that Mettetal preserved his argument for appeal.

- 10 -

the language used." *Street v. Commonwealth*, 75 Va. App. 298, 306 (2022) (quoting *Hillman v. Commonwealth*, 68 Va. App. 585, 592-93 (2018)). "A statute is not to be construed by singling out a particular phrase." *Eberhardt v. Fairfax Cnty. Emps.' Ret. Sys. Bd. of Trs.*, 283 Va. 190, 194-95 (2012) (quoting *Va. Elec. & Power Co. v. Bd. of Cnty. Supervisors*, 226 Va. 382, 387-88 (1983)). Rather, we evaluate the statutory language in the context "of the entire statute" because "it is our duty to interpret the several parts of a statute as a consistent and harmonious whole." *Cuccinelli v. Rector & Visitors of the Univ. of Va.*, 283 Va. 420, 425 (2012) (quoting *Eberhardt*, 283 Va. at 194-95). We "will not consider any portion [of a statute] meaningless unless absolutely necessary." *May v. R.A. Yancey Lumber Corp.*, 297 Va. 1, 14 (2019) (quoting *Logan v. City Council*, 275 Va. 483, 493 (2008)).

Mettetal argues that the "general public" is a narrower subgroup of the "public" that excludes "individuals acting in a specialized or professional role (such as a DMAS employee)." We need not address that argument, however, because Code § 54.1-2506.01 does not limit the Board's authority to investigate. "Under the right-result-different-reason principle, an appellate court 'do[es] not hesitate, in a proper case, where the correct conclusion has been reached but [a different] reason [is] given, to sustain the result [on an alternative] ground.'" *Vandyke v. Commonwealth*, 71 Va. App. 723, 731 (2020) (alterations in original) (quoting *Banks v. Commonwealth*, 280 Va. 612, 617 (2010)).

By providing that the Board "shall investigate all complaints" within its jurisdiction that are submitted by the general public, the statute creates a category of complaints where investigation is mandatory. *See Bland-Henderson v. Commonwealth*, 303 Va. 212, 219 (2024) ("'[A] "shall" command in a statute always means "shall," not "may."'" (quoting *Rickman v. Commonwealth*, 294 Va. 531, 537 (2017))). But it does not follow that the Board may not investigate complaints received from other sources at its discretion. In other words, the statute

specifies the circumstances under which the Board must act; it does not limit the Board's authority when it learns of potential misconduct in other circumstances. Thus, even assuming that Harrell's role as a DMAS employee excluded her from the "general public" under the statute, that fact would not limit the Board's jurisdiction to investigate. The only limitation in Code § 54.1-2506.01 is that the complaint must concern conduct within the Board's jurisdiction. For the reasons discussed below, we conclude that it did.

## II. The Board had jurisdiction to discipline Mettetal.

Generally, Virginia's health regulatory boards may "license . . . qualified applicants as practitioners of the particular profession or professions regulated by such board." Code § 54.1-2400(3). They may also "revoke, suspend, restrict, or refuse to issue" a license "for causes enumerated in applicable law and regulations." Code § 54.1-2400(7). And they may "take appropriate disciplinary action for violations of applicable law and regulations." Code § 54.1-2400(9).

Code § 54.1-2915 lists 24 instances of "unprofessional conduct" for which the Board may "revoke any license." Three such grounds expressly reference action taken by other jurisdictions. Specifically, the Board may revoke a practitioner's medical license if: "another state, the District of Columbia, a United States possession or territory, or a foreign jurisdiction, or an entity of the federal government" restricted the practitioner's license, Code § 54.1-2915(A)(5); the practitioner was convicted "in any state, territory, or country of any felony or of any crime involving moral turpitude," Code § 54.1-2915(A)(20); or the practitioner was adjudicated legally incompetent or incapacitated in any state, Code § 54.1-2915(A)(21).[12]

---

[12] The Board may also revoke a practitioner's license if the practitioner "[k]nowingly and willfully committ[ed] an act that is a felony under the laws of the Commonwealth or the United States, or any act that is a misdemeanor under such laws and involves moral turpitude." Code § 54.1-2915(A)(10). Mettetal lists subsection (10) as also referring expressly to conduct committed in another state. We view subsection (10) as more akin to the 20 grounds that lack

- 12 -

The remaining 21 grounds make no direct reference to any jurisdictional element; the overwhelming majority concern forms of misconduct, and none of them purport to limit where the misconduct must occur.[13] For example, subsection (3) provides that the Board may revoke a practitioner's license for "[i]ntentional or negligent conduct in the practice of any branch of the healing arts that causes or is likely to cause injury to a patient or patients" but does not expressly state whether that conduct must occur within Virginia before the Board may act. Code § 54.1-2915(A)(3). Mettetal argues that the Board may discipline him for his conduct outside of Virginia only if that conduct falls under one of the enumerated grounds that expressly reference other jurisdictions. We disagree.

The overriding purpose of Virginia's medical regulations is to protect "the health, safety, and welfare of the public." Code § 54.1-100. To that end, the General Assembly has tasked the Board with determining an individual's fitness to practice medicine within the Commonwealth. Code § 54.1-2400. The General Assembly plainly considers conduct committed outside the Commonwealth as relevant to an individual's fitness to practice medicine within it. Hence, a practitioner convicted of a felony in Tennessee may lose his Virginia medical license, even if the crime has no connection to Virginia.[14] Code § 54.1-2915(A)(20). The same rationale applies to the other enumerated provisions of Code § 54.1-2915. After all, "[i]ntentional or negligent conduct . . . that causes or is likely to cause injury to a patient or patients" can happen anywhere.

_____

any express reference to conduct committed outside of Virginia. As we explain, however, that distinction makes no difference to the outcome here.

[13] Certain enumerated forms of misconduct are territorially limited by their nature, though not by statute. *See, e.g.*, Code § 54.1-2915(A)(23) (failing to file death certificate with the relevant Virginia official).

[14] Indeed, if another jurisdiction revokes a practitioner's license and certain other conditions are met, the Board is *required* to suspend the practitioner's Virginia license without a hearing. Code § 54.1-2409(A).

- 13 -

Code § 54.1-2915(A)(3). And when a doctor engages in dangerous practices in another jurisdiction, the Board may reasonably be concerned that he would engage in similar conduct in Virginia, justifying prophylactic action.

"It is elemental that a state has broad power to establish and enforce standards of conduct within its borders relative to the health of everyone there." *Barsky v. Bd. of Regents*, 347 U.S. 442, 449 (1954). "The state's discretion in that field extends naturally to the regulation of all professions concerned with health." *Id.* Mettetal emphasizes "within its borders" to argue that a state cannot discipline conduct that occurs outside of its borders. But that ignores *Barsky*'s specific context. In *Barsky*, New York law authorized the suspension from practice of a physician convicted of a crime "either within or without" New York. *Id.* at 445-46. New York suspended Barsky's license after he was convicted of a crime in the United States District Court for the District of Columbia for conduct that would not be criminal if committed in New York. *Id.* at 443, 446-48. The Supreme Court of the United States rejected Barsky's constitutional challenge to New York's law, holding that "[t]he practice of medicine in New York is lawfully prohibited by [New York] except upon the conditions it imposes." *Id.* at 451. And New York's "legitimate concern for maintaining high standards of professional conduct" was not restricted to conduct committed within its borders. *Id.* at 451-52.

Other jurisdictions have also recognized the authority of their medical boards to discipline a licensed physician for conduct outside of the licensing state. For example, in *Dutchess Business Services v. Nevada State Board of Pharmacy*, 191 P.3d 1159 (Nev. 2008) (en banc), the Nevada Supreme Court held that its state pharmacy board could revoke the licenses of two pharmaceutical wholesalers that "bought and sold adulterated and misbranded prescription drugs" and purchased drugs from unlicensed distributors in other states. *Id.* at 1162-63. The court found that "[l]icensees who commit acts of unprofessional conduct, whether in this state or

elsewhere, violate the public interest of this state in its licensed pharmaceutical wholesalers." *Id.* at 1165.

Similarly, in *Colorado State Board of Medical Examiners v. Sullivan*, 976 P.2d 885 (Colo. Ct. App. 1999), the Colorado Court of Appeals upheld its state medical board's decision to revoke a practitioner's license for actions he took while practicing medicine on a federal enclave. *Id.* at 886-87. The court explained that the Colorado statute defining "unprofessional conduct" was "not limited to acts that occur only inside the state of Colorado," as evidenced by the statute's inclusion of convictions in other states. *Id.* at 887.

Finally, in *Tandon v. State Board of Medicine*, 705 A.2d 1338 (Pa. Commw. Ct. 1997), the Pennsylvania Commonwealth Court held that its state medical board could suspend a doctor's Pennsylvania license for the doctor's conduct in Tennessee, even after Tennessee had reinstated his license. *Id.* at 1348. The court explained that "Pennsylvania is in no way *required* to accede to any determination by the State of Tennessee regarding [the d]octor's fitness to practice medicine within that state. It is for Pennsylvania, and Pennsylvania alone, to determine the fitness of an individual to practice medicine" in Pennsylvania. *Id.*

The same is true of Code § 54.1-2915, which defines "unprofessional conduct." Mettetal's argument that the Board's disciplinary authority concerning conduct outside Virginia is limited to the handful of statutory grounds for revocation that specifically refer to other jurisdictions is unpersuasive. The three provisions that expressly refer to other jurisdictions each require some other body to make a formal determination, such as revoking the practitioner's license, convicting him of a felony or crime of moral turpitude, or adjudicating him incompetent. Code § 54.1-2915(A)(5), (20), (21). Those enumerated provisions expressly refer to other jurisdictions because they are concerned with formal action taken by other governmental bodies, not because they are the only forms of misconduct outside Virginia with which Virginia's

- 15 -

licensing board is concerned. In other words, those enumerated provisions focus on the relevant authority's response to the practitioner's conduct while the remaining 21 circumstances focus on the practitioner's conduct alone. Nothing in that distinction means that the other 21 circumstances are limited to conduct within Virginia. The targeted conduct in those grounds may occur anywhere.

Mettetal attempts to rely on *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), but *Dobbs* does not compel a different result. The Supreme Court held in *Dobbs* that "[t]he Constitution does not prohibit the citizens of each State from regulating or prohibiting abortion." *Id.* at 302. It follows, Mettetal argues, that one state cannot regulate the practice of medicine in another state.[15] But as the Colorado court explained in *Sullivan*, revoking a doctor's license based on conduct in another state does not improperly regulate conduct in that state; rather, it "operates solely upon that physician's future activities" in the revocation state. *Sullivan*, 976 P.2d at 888. By placing Mettetal's license on indefinite probation, the Board regulated nothing more than his future ability to practice medicine in Virginia, a power that falls squarely within the Board's authority.[16] Accordingly, the circuit court did not err by concluding that the Board had jurisdiction to discipline Mettetal for conduct he undertook in Tennessee.

---

[15] Although this case does not involve abortion, Mettetal would extend the remark in *Dobbs* to the practice of medicine generally. Nothing in this opinion should be taken to comment on the propriety of directly regulating abortion or medical care in other states.

[16] The Board found that Mettetal had violated several Virginia regulations governing prescribing buprenorphine. It is unclear that Mettetal would have been subject to those regulations for prescriptions he wrote in Tennessee under a Tennessee license, though as explained in our discussion of Mettetal's substantial evidence challenge, even if he was not, there were ample other grounds to support the revocation decision. For present purposes, we note only that any limitation on the reach of the regulations does not come from Code § 54.1-2915(A).

III. The circuit court did not err by not addressing Mettetal's federal regulations argument.

Federal regulations restrict the use and disclosure of substance abuse disorder patient records that are maintained through so-called Part 2 programs, which are federally assisted programs like Mettetal's that provide substance abuse disorder diagnosis, treatment, or referral for treatment. 42 C.F.R. §§ 2.2(a), 2.11. In general, a Part 2 program may not disclose records that "[w]ould identify a patient as having or having had a substance abuse disorder" absent patient consent or court order. 42 C.F.R. § 2.12(a)(1)(i), (d). If, "in the course of investigating or prosecuting a part 2 program," an investigative agency discovers it has received covered patient records, it must "[i]mmediately cease using and disclosing the records until [it] obtains a court order." 42 C.F.R. § 2.66(a)(3)(ii).

In his August 2021 *pro se* challenge to the Board's jurisdiction, Mettetal asserted that the Board violated Part 2 by obtaining patient records from the PMP database without patient consent. The Board did not address that argument when it denied Mettetal's motion. In his petition for appeal to the circuit court, Mettetal listed ten assignments of error, none of which addressed Part 2. In his memorandum in support of his petition, Mettetal argued, for the first time to the circuit court, that the Board violated 42 C.F.R. § 2.66 by using covered records to investigate him without first obtaining a court order. The circuit court did not address Mettetal's argument in its letter opinion. Mettetal now argues that the court erred by not doing so.

Mettetal, "as the party appealing the Board's decision, had the burden to 'designate and demonstrate an error of law subject to review by the [circuit] court.'" *New Age Care, LLC v. Juran*, 71 Va. App. 407, 420 (2020) (alteration in original) (quoting Code § 2.2-4027). "[T]he circuit court's role in an appeal from an agency decision is equivalent to an appellate court's role in an appeal from a trial court." *Id.* (quoting *Comm'r, Va. Dep't of Soc. Servs. v. Fulton*, 55 Va. App. 69, 80 (2009)). As with an appeal to this Court, the petition for appeal from an agency

action to the circuit court must "specify the errors assigned." Rule 2A:4(b). "[T]he scope of argument on appeal is limited by the assignments of error." *Dudley v. Estate Life Ins. Co. of Am.*, 220 Va. 343, 348 (1979). Appellate courts are "limited to reviewing the assignments of error presented by the litigant" and cannot "consider issues touched upon by the appellant's argument but not encompassed by his assignment[s] of error." *Banks v. Commonwealth*, 67 Va. App. 273, 289-90 (2017). Mettetal's assignments of error to the circuit court did not encompass his argument that the Board violated federal regulations by relying on the PMP records. Accordingly, the circuit court did not err by declining to address that argument.

### IV. Substantial evidence supports the Board's decision.

When determining whether substantial evidence supports an agency's decision, "a reviewing court considers the agency record in its entirety, reviewing the facts in the light most favorable to sustaining the agency's decision." *Va. Ret. Sys. v. Blair*, 64 Va. App. 756, 770 (2015) (quoting *Hedleston v. VRS*, 62 Va. App. 592, 597 (2013)). The reviewing court will reject the agency's findings only if "a reasonable mind would necessarily come to a different conclusion" after reviewing the record as a whole. *Id.* (quoting *Va. Marine Res. Comm'n v. Insley*, 64 Va. App. 569, 575 (2015)).

Mettetal argues that the circuit court erred by finding that substantial evidence supported the Board's decision to place his license on indefinite probation. The Board found Mettetal engaged in the following "unprofessional conduct":

- "Intentional or negligent conduct in the practice of any branch of the healing arts that causes or is likely to cause injury to a patient or patients." Code § 54.1-2915(A)(3).

- "Conducting his practice in such a manner as to be a danger to the health and welfare of his patients or to the public." Code § 54.1-2915(A)(13).

- "Performing any act likely to deceive, defraud, or harm the public." Code § 54.1-2915(A)(16).

- 18 -

- "Violating any provision of statute or regulation, state or federal, relating to the manufacture, distribution, dispensing, or administration of drugs." Code § 54.1-2915(A)(17).

- "Violating or cooperating with others in violating any of the provisions of Chapter[] 1 . . . and this chapter or regulations of the Board." Code § 54.1-2915(A)(18).

The identified misconduct falls into two broad categories: harm and potential harm to patients or the public, and violations of other statutes and regulations. "[W]e decide cases 'on the best and narrowest grounds available.'" *Commonwealth v. Swann*, 290 Va. 194, 196 (2015) (quoting *McGhee v. Commonwealth*, 280 Va. 620, 626 n.4 (2010)). Here, the best and narrowest ground is that substantial evidence supports the Board's findings that Mettetal's conduct created harm or the risk of harm to his patients or the public and those findings supported the Board's disciplinary decision.

The record contains substantial evidence of conduct that the Board could conclude was dangerous to Mettetal's patients and the public. For example, several of Mettetal's patients regularly tested negative for the drugs that Mettetal prescribed. Patient B tested negative for clonazepam on 13 consecutive drug screens. Patient D tested negative for clonazepam on three-quarters of 12 drug screens and regularly tested negative for gabapentin. And patient E tested negative for clonazepam four times. Yet Mettetal never altered any of those patients' prescriptions. Nor do his treatment notes indicate that he ever discussed those negative tests with those patients or took any other steps to confirm that they were taking the medicine he was prescribing. And he failed to do so despite acknowledging at the formal hearing that clonazepam is regularly sold on the street, raising the potential concern that his patients were selling the drugs that Mettetal was providing them.

Equally concerning are his patients' positive drug tests. While patient B was testing negative for prescribed clonazepam, he was testing positive for non-prescribed alprazolam.

Alprazolam, also known as Xanax, is a benzodiazepine. The treatment agreement that each patient signed specifically warned about the dangers—including the potential for fatal overdose—of mixing buprenorphine with benzodiazepines, including Xanax.[17] Mettetal testified that he told patient B not to use alprazolam, but he did not document that discussion in his notes or alter patient B's prescriptions. Patient C, meanwhile, tested positive for and admitted to using Percocet and oxycodone. In other words, patient C was using opioids in addition to the buprenorphine that Mettetal was prescribing. Yet Mettetal appears to have taken no action beyond merely documenting that fact. That inaction could have had fatal consequences for patient C. Substantial evidence supports the Board's conclusion that Mettetal's failure to address his patients' concerning drug screens was "unprofessional conduct" that posed the risk of harm to those patients or the public. Accordingly, the circuit court correctly upheld the Board's disciplinary decision.

## CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*

---

[17] Virginia regulations acknowledge the "higher risk of fatal overdose when buprenorphine is prescribed with other opioids [or] benzodiazepines." 18 VAC 85-21-150(D).